IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| HANNAH DAVID, Individually and on behalf of her minor daughter B.D., <br><br> Plaintiffs, <br><br> v. <br><br> CATHY BETTS, DIRECTOR OF THE DEPARTMENT OF HUMAN SERVICES, STATE OF HAWAII; ET AL., <br><br> Defendants. <br> _____ <br><br> AND RELATED CROSSCLAIMS AND COUNTERCLAIM. | CIV. NO. 20-00002 JMS-WRP <br><br> ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT AND RELATED JOINDERS |

**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT AND RELATED JOINDERS**

**I.  INTRODUCTION AND SUMMARY**

This Order rules on ten pending Motions or Joinders in this action

brought by Plaintiffs Hannah David ("David"), individually and on behalf of her

minor child B.D. (collectively, "Plaintiffs")[1], alleging federal claims under 42

---

[1]  The Court construes the First Amended Complaint as naming two Plaintiffs, David and B.D.  Although much of the FAC alleges actions by "Plaintiff," it is brought by "Plaintiff HANNAH DAVID, Individually and on behalf of her minor daughter, B.D.," ECF No. 119 at PageID.928, and apparently seeks relief on behalf of both.  *See, e.g.*, *id.* at PageID.945 ("As a

(continued . . . )

U.S.C. § 1983 and 18 U.S.C. § 1962(c) *et seq.*, and a state-law claim for negligent

infliction of emotional distress ("NIED").  *See* ECF No. 119.  After some

Defendants and claims were dismissed by stipulation, the remaining Defendants

are: (1) Cathy Betts, in her official capacity as Director of the State of Hawaii

Department of Human Services ("DHS") (hereinafter, "Betts");[2] (2) DHS Child

Welfare Services ("CWS") employees Aimee Leskovic ("Leskovic"), Iwalani

Kaauwai-Herrod ("Kaauwai-Herrod"), Penny Cho ("Cho"), and Dino San

Augustine ("San Augustine"),[3] in their individual capacities (collectively, "the

Individual CWS Defendants"); (3) Kauai Police Department employee Gina

Kaulukukui ("Kaulukukui"), in her individual capacity; (4) B.D.'s biological

father, William Keahiolalo ("Keahiolalo"); and (5) Keahiolalo's former attorney,

Shaylene Iseri ("Iseri").

       To summarize its rulings, the court:

---

direct and proximate result of the Defendants' aforesaid actions[,] Plaintiff and B.D. already
have suffered and will continue to suffer damages in amounts to be proven at trial.").

   [2]  The action was originally brought against Pankaj Bhanot, in his official capacity as
Director of the State DHS.  *See* ECF No. 119 at PageID.929.  Betts was substituted for Bhanot
under Federal Rule of Civil Procedure 25(d) after she became the Director.

   [3]  The First Amended Complaint names "Dino St. Augustine" as a Defendant, but his
name is "Dino San Augustine."  *See, e.g.*, ECF No. 331-4 at PageID.2755.  Although "St." is an
abbreviation for "Saint" and "San" is Spanish for "Saint," the court will refer to this Defendant
as "San Augustine" as he calls himself.

(1) GRANTS Betts' Motion for Summary Judgment, ECF No. 332, which was joined by the Individual CWS Defendants, ECF No. 374, because Plaintiffs lack standing to seek injunctive relief on behalf of others and, at minimum, cannot show a likelihood of future injury.  *See, e.g.*, *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983); *LaDuke v. Nelson*, 762 F.2d 1318, 1324–26 (9th Cir. 1985);

(2) GRANTS Iseri's Motion for Summary Judgment, ECF No. 336, because it is undisputed that Iseri owed no duty to Plaintiffs for purposes of a negligence-based claim as she had no involvement in the underlying events until December 29, 2019, and acted only as counsel for Keahiolalo.  Moreover, the RICO claim under 18 U.S.C. § 1962(c) fails for, among other reasons, a lack of injury to "business or property" and a lack of racketeering activity;

(3) DENIES Kaulukukui's Motion for Summary Judgment seeking qualified immunity, ECF No. 328, because there are genuine issues of material fact as to whether she violated a clearly established constitutional right;

(4) GRANTS Kaulukukui's Motion to Strike Declaration of Cynthia Garcia, ECF No. 352, which was joined by Betts, ECF No. 367, because Plaintiffs did not properly identify her as a witness as required by Federal Rule of Civil Procedure 26(a)(1)(A) and the failure was not substantially justified or harmless under Rule 37(c)(1);

(5) GRANTS in part and DENIES in part the Individual CWS

Defendants' Motion for Summary Judgment, ECF No. 330, which was joined by

Betts, ECF No. 366.  This Motion is granted (1) as to Count II (civil RICO), (2) as

to Count III (based on immunity under HRS § 350-3 as to the state law claim),

(3) as to all claims against Cho, and (4) as to Keahiolalo's crossclaim, but is

otherwise denied because there are genuine issues of material fact; and

(6) DENIES Plaintiffs' Motion for Partial Summary Judgment as to

Liability, ECF No. 334, which was joined by Keahiolalo, ECF No. 341, because

there are genuine issues of material fact as to liability.

The court explains its decisions in more detail to follow.

## II. <u>BACKGROUND</u>

### A.    **Factual Background**

The court has examined important aspects of this case in prior

decisions, one of which was affirmed on interlocutory appeal by the Ninth Circuit.

*See David v. Betts*, 2021 WL 1234499 (D. Haw. Mar. 31, 2021) ("*David I*"), *aff'd*

*sub nom David v. Kaulukukui*, 38 F.4th 792 (9th Cir. 2022) ("*David II*").  Although

those decisions primarily concerned claims against Kaulukukui at a motion-to-

dismiss stage, much of the background is discussed in those cases, and the court

draws upon them for some of the background here.

### 1.   *Overview*

The court begins with the broad facts of this case, which the court sets

forth largely without citation to the record because they are essentially undisputed,

at least from a 30,000-foot view.  On December 4, 2019, a Hawaii Family Court on

Kauai issued a temporary restraining order ("TRO") on a Petition for an Order of

Protection brought by Keahiolalo that restrained David from contact with

Keahiolalo, his family members, and B.D. (David's daughter), who was then 11

years old.  At the time the TRO issued, David and B.D. lived on the Big Island and

Keahiolalo lived on Kauai.

On December 20, 2019, B.D. was removed from David's custody.

B.D. was attending elementary school on the Big Island at the time of removal,

when police officers and CWS workers Lescovic and Cho arrived at the school,

along with Keahiolalo.  B.D. went with Keahiolalo to Kauai where she remained

with Keahiolalo and his family until January 3, 2020.

There is much history to Keahiolalo's and David's relationship, and

corresponding custody issues regarding B.D., and many of those details are beyond

the scope of this Order.  However, it is undisputed that almost eight years earlier,

on February 14, 2012, the Family Court on Kauai had issued a stipulated order (the

"February 14, 2012 Family Court Order"), which was meant to resolve certain

then-pending custody issues.  Among other things, the February 14, 2012 Family

Court Order stated that:

> 4.  Hannah David shall continue to have sole legal and physical custody of [B.D.].  Father shall have no visitation, supervised or otherwise, with [B.D.].  [B.D.] may relocate with Hannah off the island of Kauai and relocation shall not be considered a material change in circumstances.
>
> 5.  The Court's prior orders with respect to child support remain in full force and effect.
>
> 6.  The Court orders the entry of a no-contact physical restraining order which prohibits Mr. Keahiolalo from having any contact with Hannah David.  He is prohibited from threatening, physical or psychological abuse, or harassing or intimidating Ms. David.  Both parties are prohibited from contacting, telephoning, texting, writing, emailing or communicating in any way through third parties.  He is prohibited from coming or passing within 100 yards of her residence or place of employment or within 100 feet at neutral locations and if he does so, he is ordered to leave immediately.
>
> 7.  In the absence of a compelling emergency that affects [B.D.'s] health or safety, Mr. Keahilolalo stipulates and agrees not to file any motions in the Family Court of the State of Hawaii or another jurisdiction.  If he does so, he agrees to pay Ms. David's attorney's fees.

*See, e.g.*, ECF No. 331-10 at PageID.2779–2780.  This case largely centers around

the February 14, 2012 Family Court Order, which raises many questions about the

December 4, 2019 TRO, and the December 20, 2019 removal of B.D.

On December 31, 2019, the Family Court on Kauai (through a different Family Court judge) dissolved the December 4, 2019 TRO as to B.D. only. The dissolution was based on "lack of authority of petitioner to file on behalf of [B.D.]" ECF No. 335-3 at PageID.2906. After that December 31, 2019 dissolution, Kauai police and CWS workers—including Lescovic and Kaauwai-Herrod—acting pursuant to Hawaii Revised Statutes ("HRS") §§ 587A-8 and 587A-9, took custody of B.D. and prepared a January 6, 2020 Petition for Temporary Foster Custody, which was submitted to a Family Court Judge on the Big Island (which had jurisdiction over B.D. and David). In conjunction with that Petition, on January 6, 2020, Leskovic prepared a Safe Family Home Report deeming David's home to be unsafe and recommending temporary foster custody to protect B.D from imminent harm. ECF No. 331-14 at PageID.2808.

Meanwhile, David and B.D. filed this federal action on January 2, 2020, seeking at the time a TRO requiring return of B.D. to David's custody. *See* ECF No. 1. The CWS and some Individual CWS Defendants claim that they only learned about the existence of the February 14, 2012 Family Court Order in conjunction with this federal lawsuit. On Friday, January 3, 2020, this Court held a hearing and ordered the CWS to submit a written memorandum by Monday, January 6, 2020 detailing their efforts to arrange for supervised visitation between B.D. and David. *See* ECF No. 9. The request for a TRO was withdrawn after

7

further proceedings in Family Court on the January 6, 2020 Petition.  *See* ECF No.

19.

On January 10, 2020, a Family Court judge, acting on the January 6,

2020 Petition, returned B.D. to David's custody "with the assistance of services"

and with conditions including "participat[ion] in a psychological evalation,

intensive home based services, and random urinalysis testing, as arranged by the

DHS."  ECF No. 355-2 at PageID.3153.  And on February 28, 2020, the Family

Court issued a stipulated order on that Petition, among other things, upholding the

basis for the Petition, and placing B.D. with David subject to a CWS service plan.

ECF No. 331-15 at PageID.2811.

Of course—below the 30,000 foot view—there is much more to this

case, and many of the other details are subject to dispute.  Next, the court details

some of the key events, with many of the facts and evidence relevant to particular

Motions discussed in the sections to follow.

### 2.  *Details of Key Events*

#### a)  *The December 4, 2019 Petition for Protective Custody*

The Kauai Family Court issued the December 4, 2019 TRO based on

an application signed by Keahiolalo that was prepared and filed with the

substantial assistance of Kaulukukui, who was employed by the Kauai County

Police Department as a civilian Domestic Violence Intervention Coordinator.  ECF No. 329-1 at PageID.2658–2659.

The December 4, 2019 Petition was triggered by David's arrest on November 30, 2019, after a confrontation between David and Keahiolalo at a Kauai fire station (where Keahiolalo worked as a fireman).  According to the First Amended Complaint ("FAC"), David became upset with Keahiolalo after an incident the day before, on November 29, 2019, at a Kauai shopping center.  The details of the November 29, 2019 shopping center incident are themselves subject to dispute.  Assuming the FAC's allegations as true, the Ninth Circuit briefly described that incident as follows:

> [I]n November 2019, David and B.D. flew to Kauai for Thanksgiving to visit David's family.  While there, B.D. participated in a modeling show at a local shopping center.  Keahiolalo showed up at this event with two of his other daughters and introduced himself to B.D.  David ordered to him leave, but he "continued to follow [David] and B.D., encouraged his daughters to approach B.D., and videotaped the children's reaction."

*David II*, 38 F.4th at 796.  The record, however, now contains evidence that David, through an intermediary, had *invited* Keahiolalo to the shopping center to see B.D. in the modeling show.  Specifically, a manager from a store at the shopping center submitted a declaration explaining that David asked her to call B.D.'s father (giving her Keahiolalo's number) to tell him about the modeling show because "[B.D.] really wanted her father there."  ECF No. 331-5 at PageID.2760.  The

9

manager spoke to Keahiolalo and told him that "his daughter asked that he come down to the mall to see her modeling in the fashion show." *Id.* The manager attests that she later saw Keahiolalo and David talking in the back of the store. *Id.* at PageID.2761.

Keahiolalo described the shopping center incident in police reports, in part, as follows:

> I haven't spoken with [B.D.] or her mother, [Hannah], in years so I thought [the call] was strange. But I thought I'd check it out . . . so I went to the mall. I saw [B.D.] . . . . modeling . . . Then I saw her mom Hannah, who saw me, too, and she was yelling "What the F*** because I was there and she was upset. So I left and called my wife and daughters and decided to [eat lunch].
>
> When my family arrived, I told them [B.D.] was at the mall and asked if my daughters . . . would like to see her. They wanted to, so [we] walked down to Claire's . . . I guess Hannah was in the store, too, and she wasn't comfortable with the whole thing and said it was too much for [B.D.] so my girls and I left.
>
> As we walked away, Hannah was following us and made a huge scene in the food court. She was yelling in front of everyone and saying things about "Butch Keahiolalo" and saying terrible things about me. My daughter and I kept walking, briskly, away. . . . Hannah had chased us down and began pushing and hitting me. She was just hitting and grabbing me . . . . Not really punching with force, just repeatedly hitting my arms and pushing my chest. I told her to stop several times and she just kept going, hitting me and swearing and calling me names. My daughters were there and after it wasn't stopping, I told them to leave and go find their mom, so they left. . . .

> As I was walking away, Hannah was saying she was
> going to find my wife and find my family.

ECF No. 331-11 at PageID.2788; *see also* ECF No. 403-1 at PageID.3860–3862.

The next day, November 30, 2019, David went with B.D. to the fire station where Keahiolalo worked.  As the FAC describes it, "[David] took B.D. to Defendant Keahiolalo's workplace and demanded that he apologize to B.D., which he refused to do."  ECF No. 119 at PageID.934.  "In her state of extreme anger, [David] then proceeded to yell and swear at Defendant Keahiolalo, taunt and push him—all on videotape—until the police arrived and arrested [David] on misdemeanor charges of harassment and third[-]degree assault."  *Id.*  And as the FAC states, the incident was preserved on video, *see* ECF No. 331-12, presumably taken from a co-worker's phone.

Kaulukukui's declaration describes the incident in much more graphic detail.  She attests, in part:

> 32.  As I watched the video, I observed David say to Keahiolalo
> in B.D.'s presence that David would find Keahiolalo's wife,
> and that, "you won't have a family at the end of the day."
>
> 33.  I observed on the video that David appeared to strike
> Keahiolalo with a closed fist while the two of them were
> standing on either side of B.D.
>
> 34.  I observed on the video that David opened the front of her
> pants while standing next to B.D. and said to Keahiolalo, "You
> want to see my vagina?"

35. I observed on the video that, when David was opening her pants, B.D. appeared distressed and reached over with her hand to stop her mother while pleading, "stop," but that David ignored her.

36. I observed on the video that David pointed at B.D. while yelling at Keahiolalo, "Apologize to your f***ing daughter, you piece of sh** pu**y!"

37. I observed on the video that Keahiolalo moved some distance away from David, and that David reapproached Keahiolalo while saying, "Should I come and give you a c**k suck again?"

38. I observed David on the video striking, shoving, and kicking Keahiolalo and grabbing his genitals.

39. I observed on the video that, when David was punching, kicking, grabbing, and wrestling with Keahiolalo, B.D. could be heard off-camera crying and pleading with David to stop, but that David ignored her.

ECF No. 329-1 at PageID.2663. The court's review of the video substantiates Kaulukukui's description. *See also* ECF No. 129-2 at PageID.1057–1059 (setting forth Keahiolalo's counterclaim against David).

Based on those events, David was arrested and charged with assault and abuse of a family member under HRS § 709-906, and she later pled no contest to assault. *See* ECF No. 331-11 at PageID.2785; ECF No. 329-5; ECF No. 329-6.

At the beginning of December, Kaulukukui reviewed a police report as part of her duties with the Kauai Police Department. ECF No. 329-1 at PageID.2661. About that time, Keahiolalo came to her office seeking to obtain an

order of protection.  *Id.* at PageID.2662.  She met with Keahiolalo, and after

reviewing the report and video evidence, prepared the December 4, 2019 Petition

for Order of Protection.  *Id.* at PageID.2665.  She later took it to the fire station,

had him sign it, and she filed it with the Family Court on his behalf.  *Id*. at

PageID.2666.  The Family Court granted it on December 4, 2019.  *Id.*; ECF No.

403-1 at PageID.3869.  It barred David from having contact with Keahiolalo, his

family, *and* B.D.  ECF No. 403-1 at PageID.3870–3871.  The Family Court set the

Petition for hearing on December 18, 2019.  *Id.* at PageID.3870.  That hearing was

continued until December 31, 2019 after it became clear that the Petition had not

been served on David before December 18, 2019.  ECF No. 329-1 at PageID.2667.

  As analyzed later in this Order, there are disputes of fact about

whether Kaulukukui knew about Keahiolalo's lack of custody rights to B.D., but it

is undisputed that the Petition was sought on behalf of Keahiolalo, his family

members, and B.D.  Further details about this incident are discussed in appropriate

sections to follow.

  b) *The December 20, 2019 Removal of B.D.*

  On December 16, 2019, CWS workers received an "intake document"

stemming from the December 4, 2019 TRO.  ECF No. 335-5.  The report described

much of the background leading up to the TRO and some background regarding

the history between David and Keahiolalo.  *Id.* at PageID.2914.  The TRO had not

yet been served, and B.D. was still living with David on the Big Island. *See* ECF No. 331-1 at PageID.2742; ECF No. 335-15 at PageID.3025.

There is evidence that, on December 16, 2019, Kauai CWS worker San Augustine contacted Keahiolalo to perform a safe home check and prepare a report on his home. *See* ECF No. 335-9 at PageID.2984. And on December 17, 2019, a Big Island CWS worker, probably former-Defendant Shawn Lathrop, contacted Keahiolalo and asked him if he could come to Kona to pick up B.D. *Id.* Big Island CWS worker Lescovic also spoke with Keahiolalo on December 17, 2019. ECF No. 331-1 at PageID.2741. As explained later, it is unclear whether Keahiolalo informed her of his visitation or custody rights (or lack thereof) at that time.

On December 18, 2019, Leskovic interviewed B.D. at her school regarding, among other matters, the November 29 and 30, 2019 incidents at the shopping center and fire station. *Id.* at PageID.2742; ECF No. 335-14 at PageID.3022. She also interviewed David at her home to discuss, among other matters, the Kauai incidents. ECF No. 331-1 at PageID.2742; ECF No. 335-12. Lescovic reported that "[David] said she has a [21 year] Protection Order that was issued in 2013 [that] states dad can not be around her, their child, or any of her family from Kauai." ECF No. 335-12 at PageID.3020. Her notes also state that "[David] said she has full legal and physical custody with prejudice. . . . She was

14

told to get copies of all legal and pertinent information to me asap."  *Id.*  On

December 19, 2019, Leskovic prepared a safety assessment of David, giving her a

risk score of 3, on a scale from 1 to 51, indicating a "low/moderately low" level of

risk.  ECF No. 335-19 at PageID.3031.

   The record contains other evidence that, from December 17, 2019 to

December 20, 2019, CWS workers were discussing a plan to have Keahiolalo

come to the Big Island so that B.D. could be "transferred" from David to

Keahiolalo (or "returned" to Keahiolalo).  *See, e.g.*, ECF No. 335-9 at

PageID.2984 ("During this visit, Dino [San Augustine] repeatedly stated that this

was not a placement, it was a return of B.D. since [Keahiolalo] was B.D.'s

father."); *id.* at PageID.2985 (Text message from "CWS" to Keahiolalo, stating

"[a]lso let the police know if you are able to come over and get your child right

away.  That may prevent them from handing the child over to us for custody").

And, on December 20, 2019, as set forth above, police officers along with

Lescovic and Cho, went to B.D.'s school with Keahiolalo.  *See* ECF No. 335-8 at

PageID.2970–2973.  Keahiolalo then took her to Kauai.  *Id.*

   Other details about the knowledge various Individual CWS

Defendants and Kaulukukui had about Keahiolalo's custody rights during this time

period are discussed to follow when analyzing the individual Motions.  But all of

the Individual CWS Defendants attest that they had no knowledge of the February

14, 2012 Family Court Order until this litigation began on January 2, 2020.  They

contend that such family court orders are sealed, and the family court dockets are

not routinely available for search.

As described by the Ninth Circuit, and based on the FAC's

allegations,

> David was not informed that B.D. had been taken from
> school and transported to Kauai until after B.D. was
> placed in Keahiolalo's custody and police officers served
> the TRO on David at her home.  David and her attorney
> attempted to contact CWS, the police, and the Kauai
> court to get information about B.D.'s whereabouts, but
> they were unsuccessful. . . .  David also reported to the
> Kauai County Police Department "that B.D. had been
> kidnapped and was in the custody of an allegedly
> abusive, non-custodial parent."  But Kaulukukui and the
> other named defendants worked together to prevent
> David's allegations from being investigated or a police
> report from being filed.

*David II*, 38 F.4th at 797.  At this stage, however, there is no evidence that

Kaulukukui did anything to "prevent David's allegations from being investigated

or a police report from being filed."

c)      *The December 31, 2019 Kauai Family Court Hearing*

During a  December 31, 2019, Kauai Family Court hearing, David's

counsel—some say for the first time—provided a copy of the February 14, 2012

Family Court Order.  *See* ECF No. 359-2 at PageID.3208.  The Family Court judge

concluded that, even if Keahiolalo's "parental rights" were not terminated, he had

no basis to file a petition for protection on B.D.'s behalf because he had no custody rights. *Id.* at PageID.3236. He also opined that because B.D. and David reside on the Big Island, a proper filing regarding custody, or under the provision in the February 14, 2012 Family Court Order regarding a "compelling emergency that affects [B.D.'s] health or safety," should be brought in a Family Court on the Big Island. *Id*. at PageID.3238. He thus found that jurisdiction and venue were improper over B.D. in the Kauai Family Court. *Id.* The Family Court dissolved the TRO as to B.D., but left it in place for five years as to Keahiolalo and his family. *Id.* at PageID.3243.

## B.    Procedural Background

Plaintiffs filed this suit on January 2, 2020, against Pankaj Bhanot (both personally and in his official capacity as the Director of the DHS); CWS official Leskovic, Keahioalo, Iseri, Kris Kosa-Correia, who was Principal at B.D.'s school; and Todd Raybuck, who was then the Kauai County police chief. *See* ECF No. 1 at PageID.3–4. On July 7, 2020, the court dismissed Raybuck as a Defendant. *See* ECF No. 91; *David v. Bhanot*, 2020 WL 3803881 (D. Haw. July 7, 2020). On September 22, 2020, Plaintiffs filed the FAC against Bhanot, Leskovic, Cho, Kaulukukui, Kaauwai-Herrod, San Augustine, and Lathrop. ECF No. 119. The FAC alleges three Counts:

17

Count I is a claim brought under 42 U.S.C. § 1983 against Bhanot (now Betts), Leskovic, Lathrop, Kaauwai-Herrod, Cho, San Augustine, and Kaulukukui.  ECF No. 119 at PageID.944–945.  Count II is a civil Racketeer Influenced and Corrupt Organizations ("RICO") claim under 18 U.S.C. § 1961 et seq., against Leskovic, Lathrop, Kaauwai-Herrod, Cho, San Augustine, Keahiolalo, and Iseri.  ECF No. 119 at PageID.946.  And Count III is a claim for negligence or NIED under Hawaii law against all Defendants.  *Id.*  Additionally, several cross- and counterclaims were filed.  *See, e.g.*, ECF Nos. 129-1, 129-2, 138-1, 147-1, 150-1, 162-2.

On March 31, 2021, the court issued an Order that, among other matters, denied in part and granted in part a motion to dismiss brought by Kaulukukui that sought qualified immunity from federal claims, and a qualified privilege as to state-law claims.  *See* ECF No. 176; *David I*, 2021 WL 1234499. The court denied qualified immunity to Kaulukukui at that motion-to-dismiss stage, but granted immunity as to a § 1983 crossclaim brought by Keahiolalo against her.  *See* ECF No. 176 at PageID.1459–1460; *David I*, 2021 WL 1234499 at *12.  Kaulukukui filed an interlocutory appeal of the denial of qualified immunity.  ECF No. 179.  On June 9, 2021, the court denied Plaintiffs' motion seeking certification that the appeal was frivolous, and allowed the appeal to proceed.  *See* ECF No. 202; *David v. Betts*, 2021 WL 2355391 (D. Haw. June 9,

18

2021).  The court then stayed the litigation pending a result on Kaulukukui's interlocutory appeal.  *See* ECF No. 204.  And, on June 27, 2022, the Ninth Circuit affirmed the denial of qualified immunity as to Kaulukukui.  *See* ECF No. 207; *David II*, 38 F.4th at 804.

On December 2, 2022, the parties stipulated to dismiss without prejudice all claims against Lathrop.  ECF No. 232.  On January 21, 2023, the parties stipulated to dismiss all official-capacity claims for damages against Betts and against any Individual CWS Defendants (presumably because Eleventh Amendment immunity applies as to certain claims).  ECF No. 254.  And on January 27, 2023, a Magistrate Judge denied Plaintiffs' motion seeking leave to file a second amended complaint that would have added a deputy attorney general as a Defendant.  *See* ECF No. 252; *David v. Betts*, 2023 WL 1069683 (D. Haw. Jan 27, 2023).

Thereafter, the subject Motions and Joinders were filed.  *See* ECF Nos. 328, 330, 332, 334, 336, 341, 352, 366, 367, and 374.  On January 4, 2024, the court submitted Betts' Motion for Summary Judgment, ECF No. 332 (and related Joinder, ECF No. 374), as well as Iseri's Motion to Dismiss or for Summary Judgment, ECF No. 366, for decision without a hearing under Local Rule 7.1(c).  *See* ECF No. 404.  On January 5, 2024, the court heard oral argument

on the remaining Motions and Joinders, ECF Nos. 328, 330, 334, 341, 352, 366, and 367.

### III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law."  *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"The moving party initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  "When the moving party has carried its burden . . . its opponent must do more than simply show that there is some metaphysical doubt as to the material facts"; instead, the opponent must "come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (citation and internal quotation marks omitted).  "This burden is not a light one.  The non-moving party must show more than the mere existence of a scintilla of evidence."  *In re Oracle*, 627 F.3d at 387 (citation omitted); *see also Anderson*, 477 U.S. at 248 (stating that a party

cannot "rest upon the mere allegations or denials of his pleading" in opposing

summary judgment).

    When considering a motion for summary judgment, the court views

the facts and draws reasonable inferences in the light most favorable to the

nonmovant. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "[T]he court does not

make credibility determinations or weigh conflicting evidence. Rather, it draws all

inferences in the light most favorable to the nonmoving party." *Soremekun v.

Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

    "When the party moving for summary judgment would bear the

burden of proof at trial, 'it must come forward with evidence which would entitle it

to a directed verdict if the evidence went uncontroverted at trial.'" *C.A.R. Transp.

Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting

*Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)). And so, a Plaintiff

moving for summary judgment on an affirmative claim "must establish beyond

peradventure *all* of the essential elements of the claim . . . to warrant judgment in

his [or her] favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

Put another way, a plaintiff's "showing must be sufficient for the court to hold that

no reasonable trier of fact could find other than for the moving party." *Calderone

v. United States,* 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. Schwarzer,

21

*Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 488 (1984)).

## IV.  <u>DISCUSSION</u>

To follow, the court analyzes each of the pending Motions separately, but because the Motions and issues overlap, the analysis for some of the Motions relies upon relevant discussion of the issues and evidence in prior Motions.  That is, the court does not fully repeat legal concepts or the factual background for each Motion.

The court begins with the two Motions that were submitted without oral argument—Betts' and Iseri's Motions for Summary Judgment—followed by the other Motions which were argued on January 5, 2024.

### A.    **Defendant Betts' Motion for Summary Judgment**

Betts seeks summary judgment on the only claim against her—a claim under Count I, seeking "entry of a permanent injunction restraining the Defendants, their agents, employees, and successors in interest from continuing to seize and restrain children without first obtaining a court order."  ECF No. 119 at PageID.947.  David describes the nature of the injunctive relief sought as wanting "the unauthorized seizure of children to stop, including my child."  ECF No. 331-17 at PageID.2822.

As explained earlier, Betts is a Defendant only in her official capacity as Director of the DHS.  The claim is thus treated as a claim against the State of Hawaii itself.  *See, e.g.*, *R.W. v. Columbia Basin Coll.*, 77 F.4th 1214, 1222 (9th Cir. 2023) ("We treat a claim against a government officer in her official capacity as a claim against the employing entity.") (citing *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985)).  Accordingly, Betts is a proper Defendant under *Ex parte Young*, 209 U.S. 123 (1908), for purposes of potential prospective injunctive relief as to the State of Hawaii DHS and its CWS department.  *See, e.g.*, *R.W.*, 77 F.4th at 1223 ("An official-capacity suit for injunctive relief is properly brought against persons who would be responsible for implementing any injunctive relief.") (citations and internal quotation marks omitted).[4]  For a claim for injunctive relief to proceed under *Ex parte Young*, there must be "an ongoing violation of federal law."  *Id.* at 1221 (citing *Koala v. Khosla*, 931 F.3d 887, 895 (9th Cir. 2019)).

But, whether analyzed in terms of standing or equitable relief, Plaintiffs' claim for injunctive relief fails because Plaintiffs—who have no standing to "rais[e] another person's legal rights," *Allen v. Wright*, 468 U.S. 737,

---

[4] Betts is not a proper Defendant for purposes of injunctive relief as to the other Defendants who are not her employees (i.e., Kaulukukui, Keahiolalo, and Iseri), absent some showing—which has not been made—that these other Defendants are controlled by Betts. Nevertheless, although this Motion was brought only by Betts, the analysis precluding the injunctive relief sought in the FAC applies equally to the other Defendants.  *See, e.g.*, *Silverton v. Dep't of Treasury*, 644 F.2d 1341, 1345 (9th Cir. 1981) ("A [d]istrict [c]ourt may properly on its own motion dismiss an action as to defendants who have not moved to dismiss where such defendants are in a position similar to that of moving defendants . . . .").

751 (1984)—cannot show a likelihood that they face relevant injury in the future. *See, e.g.*, *Rapp v. Disciplinary Bd. of Haw. Sup. Ct.*, 916 F. Supp. 1525, 1531 (D. Haw. 1996) ("In order to have standing to obtain prospective injunctive relief, a plaintiff must show some substantial likelihood that the past challenged official conduct will recur in the future.") (citing *Lyons*, 461 U.S. at 108) (other citations omitted). "At a minimum, *Lyons* requires that the 'personal stake' showing necessary under Article III [standing] in cases involving injunctive relief includes an essential showing of the likelihood of similar injury in the future." *LaDuke*, 762 F.2d at 1324. To make such a showing, a plaintiff "must demonstrate that a 'credible threat' exists that they will again be subject to the specific injury for which they seek injunctive or declaratory relief." *Sample v. Johnson*, 771 F.2d 1335, 1340 (9th Cir. 1985) (citing *Kolender v. Lawson*, 461 U.S. 352, 355 n.3 (1983)). That is, "[a] 'reasonable showing' of a 'sufficient likelihood' that plaintiff will be injured again is necessary." *Id.* (quoting *Lyons*, 461 U.S. at 108); *see also Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1042 (9th Cir. 1999) ("The Supreme Court has repeatedly cautioned that, absent a threat of immediate and irreparable harm, the federal courts should not enjoin a state to conduct its business in a particular way.") (citations omitted).

Here, applying these standards and based on the evidence in the record, Plaintiffs' claim against Betts for injunctive relief to prevent Defendants

from "continuing to seize and restrain children without first obtaining a court order," ECF No. 119 at PageID.947, plainly fails at this summary judgment stage.

To be precise, and contrary to Plaintiffs' argument, the removal of B.D. from David's custody on December 20, 2019 did not occur without any court order:  There *was* an order prohibiting David from having contact with B.D., even if it did not specifically authorize removal.  It is undisputed that the Family Court had issued a TRO on Keahiolalo's Petition for an Order of Protection on December 4, 2019.  *See* ECF No. 331-8.  It is likewise undisputed that the TRO restrained David from having contact with B.D.  *See id.* at PageID.2774.  A reasonable official—depending on their knowledge of the circumstances—could believe that enforcing such an order to restrain contact might require B.D. to be separated from David.  As analyzed to follow with the other Motions, there are factual questions revolving around each Defendant's particular knowledge about that December 4, 2019 TRO (i.e., whether it was wrongfully obtained) and whether aspects of its enforcement (such as placing B.D. with Keahiolalo after removing her from David) were authorized and violated constitutional rights.  But there was a court order of some sort.

Subsequently, on December 31, 2019, the Family Court dissolved the December 4, 2019 TRO as to B.D. (but not as to David's prohibition of contact with Keahiolalo and his family members).  At that point, the undisputed evidence

is that CWS personnel and Kauai Police then proceeded under HRS §§ 587A-8[5]

and 587A-9[6] to assume protective custody of B.D. without a court order.  *See* ECF

---

[5] Section 587A-8 provides in pertinent part:

§587A-8 Protective custody by police officer without court order.

(a) A police officer shall assume protective custody of a child without a court order and without the consent of the child's family, if in the discretion of the police officer, the officer determines that:
    (1) The child is subject to imminent harm while in the custody of the child's family; . . .

. . . .

(b) The department shall assume temporary foster custody of the child when a police officer has completed the transfer of protective custody of the child to the department as follows:
    (1) A police officer who assumes protective custody of a child shall complete transfer of protective custody to the department by presenting physical custody of the child to the department . . . .

[6] Section 587A-9 provides in pertinent part:

Temporary foster custody without court order.

(a) When the department receives protective custody of a child from the police, the department shall:
    (1) Assume temporary foster custody of the child if, in the discretion of the department, the department determines that the child is subject to imminent harm while in the custody of the child's family;
    (2) Make every reasonable effort to inform the child's parents of the actions taken, unless doing so would put another person at risk of harm;
    (3) Unless the child is admitted to a hospital or similar institution, place the child in emergency foster care while the department conducts an appropriate investigation, with placement preference being given to an approved relative;

. . . .

(continued . . . )

No. 331-13 at PageID.2793. As part of that proceeding, CWS filed a January 6, 2020 Petition for Temporary Foster Custody, seeking to place B.D. in temporary foster custody based on an allegation—and a later finding—of "imminent harm" (justified largely by the same evidence that led to the December 4, 2019 TRO). *See* ECF No. 331-14; ECF No. 331-6 at PageID.2768; ECF No. 331-3 at PageID.2754; ECF No. 396-1 at PageID.3826; ECF No. 331-15 at PageID.2810– 2811 (February 28, 2020 Family Court order to which David stipulated finding that "there is an adequate basis to sustain the Petition for Temporary Foster Custody filed on January 6, 2020 in that [B.D.] is a child whose physical or psychological health or welfare has been harmed or is subject to threatened harm . . .").

Further, Plaintiffs do not dispute that B.D. was removed from Keahiolalo's home and placed in temporary foster care on January 3, 2020, after "CWS receiv[ed] the February 2012 order," ECF No. 365 at PageID.3422; *see also* ECF No. 331-3 at PageID.2754. Although there might be disputes about whether some Defendants otherwise knew about Keahiolalo's lack of custody rights earlier,

---

(5) Within three days, excluding Saturdays, Sundays, and holidays:
    (A) Relinquish temporary foster custody, return the child to the child's parents, and proceed pursuant to section 587A-11(4), (5), or (6);
    (B) Secure a voluntary placement agreement from the child's parents to place the child in foster care, and proceed pursuant to section 587A-11(6) or (8); or
    (C) File a petition with the court.

it is undisputed that the January 6, 2020 Petition told the Family Court of Hawaii's

Third Circuit, among other facts, that

> Child does not have a legal custodian willing and able to
> provide a safe family home.  Father is a non-custodial
> parent and is unable to have contact with Child due to
> Mother's TRO.

ECF No. 331-14 at PageID.2798.[7]

The January 6, 2020 Petition was timely under HRS § 587A-9(a)(5)

(requiring a petition "[w]ithin three days, excluding Saturdays, Sundays, and

holidays" of taking of custody).[8]  The December 4, 2019 TRO was dissolved as to

B.D. on December 31, 2019.  The next day, Wednesday, January 1, 2020, was a

holiday.  Excluding the following Saturday and Sunday (January 4 and 5, 2020),

the Petition was timely filed on Monday, January 6, 2020—three days after Kauai

police took protective custody, excluding the weekend and New Year holiday.  *See*

---

[7] In context, the "Mother's TRO" appears to refer to the February 14, 2012 Family Court
Order.

[8] Hawaii Family Court Rule 6(a) provides in relevant part:

> In computing any period of time prescribed or allowed by these
> Rules, by order of court, or by any applicable statute, the day of the
> act, event, or default after which the designated period of time
> begins to run shall not be included.  The last day of the period so
> computed shall be included unless it is a Saturday, a Sunday or a
> holiday, in which event the period runs until the end of the next
> day which is not a Saturday, a Sunday or a holiday.  When the
> period of time prescribed or allowed is less than 7 days,
> intermediate Saturdays, Sundays and holidays shall be excluded in
> the computation.

ECF No. 331-14.  Corresponding hearings on the January 6, 2020 Petition occurred

within two days thereafter, beginning on January 8, 2020, and continuing to

January 10, 2020.[9]  *See id.*; ECF No. 355-2 at PageID.3151.

It is thus undisputed that after the December 31, 2019 Family Court

hearing, the Individual CWS Defendants and Kauai police were acting under

authority of HRS Chapter 587A, which authorizes removal of children without a

court order in situations of "imminent harm."  *See* HRS § 587A-4 (defining

"imminent harm").[10]

And so, the only period that could be at issue for purposes of

evaluating injunctive relief against Betts is from December 20, 2019 until

December 31, 2019, the period when B.D. was removed from David's custody in

reliance on the December 4, 2019 TRO.  It was only during this period that—

construing evidence in favor of Plaintiffs—any CWS official could have been

"seiz[ing] and restrain[ing] children without first obtaining a [valid] court order"

for purposes of assessing the sought-after injunctive relief against Betts.  ECF No.

119 at PageID.947.  And even if a CWS official did so wrongfully at that time,

---

[9]  *See* HRS § 587A-26(a) ("When the department assumes temporary foster custody of a child and files a petition pursuant to this chapter, the court shall conduct a temporary foster custody hearing within two days after the petition is filed, excluding Saturdays, Sundays, and holidays.").

[10]  Section 587A-4 provides: "'Imminent harm' means that without intervention within the next ninety days, there is reasonable cause to believe that harm to the child will occur or reoccur."

there is no evidence in the record that CWS is "continuing" to remove children from parents based solely on a Family Court order on a petition for protection that restrains a parent from having contact with a child. *Id.*  More generally, there is no evidence in the record that any Defendant has a continuing policy of removing children from parents, and placing them with an unauthorized person without any court order, and without otherwise complying with HRS Chapter 587A in situations of imminent harm.[11]  *See, e.g.*, *Rapp*, 916 F. Supp. at 1531 (citations

---

[11]  Plaintiffs cite to an online article from the *Honolulu Civil Beat*, which states that children in Hawaii are often taken from families without a judge's approval.  *See* ECF No. 335-6; ECF No. 363-3.  This media source is not evidence, and Plaintiffs have not attempted to establish a hearsay exception for statements made within the article.  *See, e.g.*, *Larez v. City of L.A.*, 946 F.2d 630, 642–43 (9th Cir. 1991) ("While newspaper articles have been held inadmissible hearsay as to their content . . . few cases have addressed this question in light of the requirements of Rule [807].").  The court cannot consider any instances reported in that article, especially without knowing through actual evidence the precise circumstances of other cases.

Nevertheless, Betts contends that Hawaii currently has no statutory provision or formal process whereby the DHS can seek a specific court order authorizing emergency removal *prior* to taking custody of a child who is at risk of imminent harm.  ECF No. 397 at PageID.3837; ECF No. 396-1 at PageID.3827.  If so—and Plaintiffs have not argued otherwise—even if the court issued an injunction preventing removals without specific state court orders, there apparently is no mechanism or practice in place for Defendants to obtain such a court order prior to removal.  The only existing *statutory* process is to do so *without* a court order under HRS Chapter 587A, and then file a petition requiring a prompt hearing—which was done in this case on January 6, 2020.

The court is aware of pending Hawaii legislation to establish a court process for obtaining a specific order prior to removal.  *See* S. Bill 2245, 32nd Leg., Reg. Sess. (2024).  That Bill was passed by the Hawaii Legislature on April 23, 2024, and awaits decision by the Governor.  The Hawaii Legislature's Summary of the Bill reads as follows:

> Adds a definition for "exigent circumstances" and amends the definitions of "harm" and "imminent harm" under the Child Protective Act.  Clarifies when the police may take protective custody of a child and when the Department of Human Services may assume temporary foster custody of a child when exigent circumstances are present.  Creates a judicial process for filing a

(continued . . . )

omitted) ("[A] plaintiff must show some substantial likelihood that the past

challenged official conduct will recur in the future."); *LaDuke*, 762 F.2d at 1324

(requiring a "likelihood of similar injury in the future"); *Sample*, 771 F.2d at 1340

(requiring a credible threat that plaintiffs "will again be subject to the specific

injury for which they seek injunctive or declaratory relief"); *Hodgers-Durgin*, 199

F.3d at 1042 (requiring a threat of immediate and irreparable harm).

What's more, there is no evidence that it is likely that any Defendant

will again remove B.D. from David based only on a Family Court order of

protection such as the December 4, 2019 TRO, or that David faces a threat of such

action.  For that to occur, David would have to again be accused of endangering

B.D., and then again be restrained from contact with B.D. by the Family Court, and

then B.D. would have to be removed again from David's custody and placed with

Keahiolalo (or another unauthorized person).  Such an entirely unlikely scenario is

insufficient to justify prospective injunctive relief.  *See, e.g.*, *LaDuke*, 762 F.2d at

1324 (reasoning that the *Lyons* requirement of a "threat of repeated injury" was

"beyond reasonable belief given the remote possibility that Lyons would once

again violate the law and incite an unjustifiable response by the Los Angeles

---

petition for an order for protective custody, including the
circumstances where such an order may be issued without notice
and without a hearing.  Effective July 1, 2025. (HD2).

https://legiscan.com/HI/bill/SB2245/2024; https://perma.cc/2BKQ-DCCK.

police.") (citing *Lyons*, 461 U.S. at 107 n.8); *Lyons*, 461 U.S. at 111 ("Absent a sufficient likelihood that [plaintiff] will again be wronged in a similar way, [plaintiff] is no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional.").

For those reasons, the court GRANTS Betts' Motion, ECF No. 332. The court has no basis to award the injunctive relief sought in the FAC.

## B.    Defendant Shaylene Iseri's Motion for Summary Judgment

Next, Iseri moves for summary judgment as to the two claims against her, Counts II (federal RICO violation) and III (negligence/NIED).[12]

It is undisputed that Iseri is a Hawaii-licensed attorney, who was retained by Keahiolalo on December 29, 2019 to represent him at the December 31, 2019 hearing in Family Court on his Petition for an Order of Protection. *See* ECF No. 359 at PageID.3197–3198. As to Iseri, the FAC alleges that "[t]hrough counsel, Defendant Iseri and Defendant Keahiolalo strenuously opposed [David's] oral motion to dismiss [the Petition for an Order of Protection] and argued that

---

[12]    Iseri filed a "Concise Statement of Facts in Support of Motion to Dismiss First Amended Verified Complaint for Declaratory and Injunctive Relief and Damages Filed on September 22, 2020 . . . or in the Alternative for Summary Judgment." ECF No. 336. The court initially construed that filing as a Motion to Dismiss, or in the Alternative, for Summary Judgment. *See* ECF No. 337. Upon closer review, the court considers it as a Motion for Summary Judgment.

'there is or must be a CWS order' authorizing the legal seizure of B.D. even though no order could be or ever was produced in Court."  ECF No. 119 at PageID.939–940.  It also alleges, that "[upon information and belief,] following the hearing in the Family Court on December 31, 2019, Defendants Kaauwai-Herrod, Leskovic, [San] Augustine, Iseri, and Keahiolalo maliciously conspired to generate a report deeming Plaintiff and Plaintiff's home unsafe for the purpose of enabling Defendant Iseri to refile for protective custody of B.D. [on] Defendant Keahiolalo's behalf."  *Id.* at PageID.941.[13]

But it is undisputed that Iseri was on vacation from December 13, 2019 through December 27, 2019.  *See* ECF No. 359 at PageID.3198.  There is no evidence that she had any involvement in relevant events prior to being retained by Keahiolalo on December 29, 2019.[14]  Moreover, Plaintiffs have admitted that "Iseri

---

[13]  Based on those allegations, the FAC alleges civil RICO violations in Count II:

> Plaintiff is informed and believes, and thereupon alleges, that the Defendants in their individual capacities engaged herein in a pattern of racketeering activity that was intended and carried out to cause injuries to Plaintiff and B.D. by impermissibly seizing and kidnapping B.D., making untruthful reports or statements about Plaintiff, and refusing to allow any visitation or communication between Plaintiff and B.D. in deliberate disregard of an outstanding and valid state court order thereby violating 18 U.S.C. Section 1962(c), *inter alia*.

ECF No. 119 at PageID.946.

[14]  The FAC alleges that Iseri is a former Kauai County Prosecuting Attorney who "declined to file any charges against Defendant Keahiolo," after David "attempted to file rape charges against [Keahiolalo]."  ECF No. 119 at PageID.932.  But this allegation concerns events

(continued . . . )

was not present nor involved in the removal of [B.D.] from The Big Island, nor involved in the placement of [B.D.] with Keahiolalo as [D.B.] was removed and placed prior to Iseri being retained." *Id.* at PageID.3199.  And, most importantly, Plaintiffs admitted that "[a]t no time did Iseri conspire with Kaauwai-Herrod, Leskovic, [San] Augustine or Keahiolalo to generate a report deeming David unsafe and Keahiolalo safe." *Id.* at PageID.3200.  Plaintiffs admitted that "[a]t no time did Iseri file or refile for protective custody of [B.D.] on behalf of Keahiolalo nor anyone else." *Id.* at PageID.3201.  And they further admitted that "[a]t no time did Iseri kidnap [B.D.] nor was she ever investigated for kidnapping [B.D.]." *Id.* Plaintiffs have thus essentially admitted that they have no evidence to support their civil RICO claims in Count II against Iseri.

A civil RICO claim consists of four elements: "a defendant must participate in (1) the conduct of (2) an enterprise that affects interstate commerce (3) through a pattern (4) of racketeering activity or collection of unlawful debt." *Puana v. Kealoha*, 2023 WL 374064, at *4 (D. Haw. Jan. 24, 2023) (quoting *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir.

---

that occurred in 2011, and has little if anything to do with the claims in the FAC.  In any event, Iseri explains that she was the Kauai Prosecutor from December 2008 to December 2012, but did not personally investigate the charges against Keahiolalo.  ECF No. 336-2 at PageID.3072–3073. She further attests that a deputy prosecutor declined to prosecute in light of a lack of evidence and that "the complainant [David] strongly expressed to [a Kauai police detective] that she did not wish to make a Sexual Assault [complaint] against the Defendant."  *Id.*; *see also* ECF No. 336-3 at PageID.3080.  Plaintiffs offered no evidence to contradict Iseri's explanation.

2014)).  A plaintiff must also demonstrate RICO standing, that is, "a plaintiff must show: (1) that his alleged harm qualifies as injury to his business or property; and (2) that his harm was 'by reason of' the RICO violation."  *Id.* (quoting *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co.*, 943 F.3d 1243, 1248 (9th Cir. 2019)).  Among these elements, "racketeering activity" requires "predicate acts," which

> include any act "indictable" under specified federal statutes, [18 U.S.C.] §§ 1961(1)(B)–(C), (E)–(G), as well as certain crimes "chargeable" under state law, § 1961(1)(A), and any offense involving bankruptcy or securities fraud or drug-related activity that is "punishable" under federal law, § 1961(1)(D).  A predicate offense implicates RICO when it is part of a "pattern of racketeering activity"—a series of related predicates that together demonstrate the existence or threat of continued criminal activity.  *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989); *see* § 1961(5) (specifying that a "pattern of racketeering activity" requires at least two predicates committed within 10 years of each other).

*RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 330 (2016).

Here, given Plaintiffs' admissions, their RICO claim against Iseri fails.  At minimum, Plaintiffs have no evidence of loss to "business or property" for purposes of RICO standing.  There is no evidence of an "enterprise," nor of a pattern of racketeering activity.  There is no evidence of a predicate act, much less "at least two predicates committed within 10 years of each other."  *Id.*  Nor is there evidence of "the existence or threat of continued criminal activity."  *Id.*  The only

evidence Plaintiffs point to in the record consists of arguments or actions Iseri

made during the Kauai Family Court proceedings on December 31, 2019, which

have nothing to do with a civil RICO claim.  *See* ECF No. 358 at PageID.3191–

3192.  Iseri is entitled to summary judgment in her favor as to Count II.

      Plaintiffs' negligence-based claim against Iseri in Count III also fails.

A claim for negligence or NIED requires, among other elements, a duty of care

owed by a defendant to a plaintiff.  *See, e.g.*, *Goran Pleho, LLC v. Lacy*, 144 Haw.

224, 238–39, 439 P.3d 176, 190–91 (2019).  But it is well-established in Hawaii

law that an attorney owes no duty for purposes of negligence to an adversary of the

attorney's client.  *See, e.g.*, *Buscher v. Boning*, 114 Haw. 202, 220, 159 P.3d 814,

832 (2007) ("[The] creation of a duty in favor of an adversary of the attorney's

client would create an unacceptable conflict of interest.") (quoting *Myers v. Cohen*,

5 Haw. App. 232, 246, 687 P.2d 6 (Ct. App. 1984)*, rev'd on other grounds*, 67

Haw. 389, 688 P.2d 1145 (1984)); *Aubart v. McCarthy*, 2020 WL 4722379, at *3

(D. Haw. Aug. 13, 2020) ("Hawaii courts have held that an attorney owes no duty

to her client's adversary.") (citing *Buscher*, 114 Haw. at 220, 159 P.3d at 832).

      Again, it is undisputed that, at all relevant times, Iseri was acting

solely in her capacity as attorney for Keahiolalo during the December 31, 2019

proceedings.  And there is no evidence, for example, that David was a beneficiary

of documents Iseri was drafting for Keahiolalo—that is, there is no type of special

relationship that could conceivably create a duty. *See Aga v. Steele*, 2009 WL 649914, at *9 (D. Haw. Mar. 12, 2009) (granting summary judgment for a defendant-attorney on a malpractice claim, reasoning that "[the malpractice] claim fails because Defendant did not represent Plaintiffs, Plaintiffs were not beneficiaries of trust documents drafted by Defendant, and Defendant owed no duty to Plaintiffs . . . . Instead, Defendant was Plaintiffs' adversary") (citing *Buscher*, 114 Haw. at 220, 159 P.3d at 832). In short, the NIED claim fails as a matter of law. Summary judgment is granted in favor of Iseri as to Count III.[15] Iseri is DISMISSED as a defendant in this case.

## C.    Defendant Kaulukukui's Motion for Summary Judgment

Next, Kaulukukui moves for summary judgment, arguing that she is protected by qualified immunity (as to the § 1983 claim against her in Count I) and by a state-law qualified privilege (as to the negligence claim against her in Count III). *See* ECF No. 328.[16] As detailed to follow, the court denies this Motion

---

[15] Because the court grants summary judgment in favor of Iseri on Counts II and III, the court need not reach Iseri's argument that Plaintiffs' claims are barred by a litigation privilege. *See, e.g.*, *Kahala Royal Corp. v. Goodsill Anderson Quinn & Stifel*, 113 Haw. 251, 266–72, 151 P.3d 732, 747–53 (2007) (discussing scope of litigation privilege); *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 851 (9th Cir. 2004) (agreeing with the Seventh Circuit's holding that "a state absolute litigation privilege purporting to confer immunity from suit cannot defeat a federal cause of action") (quoting *Steffes v. Stepan Co.*, 144 F.3d 1070, 1074 (7th Cir. 1998)).

[16] Kaulukukui is not named in Count II.

because there are genuine issues of material fact, in particular as to whether (or when) Kaulukukui had knowledge that Keahiolalo had no right to custody of B.D.

### 1. *Qualified Immunity Standards and Prior Qualified Immunity Proceedings*

"Qualified immunity shields government officials from liability under § 1983 if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Rieman v. Vasquez*, 96 F.4th 1085, 1092 (9th Cir. 2024) (quoting *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1151 (9th Cir. 2021)). To make that determination, courts "consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Id.* (quoting *Lal v. Cal.*, 746 F.3d 1112, 1116 (9th Cir. 2014)). If the answer to either question is no, then the official has qualified immunity. Courts have discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"A clearly established constitutional right 'must be particularized to the facts of the case.'" *Rieman*, 96 F.4th at 1092 (quoting *Davis v. United States*, 854 F.3d 594, 599 (2017)). And "[b]ecause the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the

backdrop of the law at the time of the conduct." *Id.* (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)).[17]

As summarized earlier, Kaulukukui raised these two immunity defenses at the motion-to-dismiss stage, but the court denied her motion because the FAC plausibly alleged that Kaulukukui knew about the February 14, 2012 Family Court Order, and knew that Keahiolalo had no custody rights when she assisted him in preparing the December 2, 2019 Petition. *See David I*, 2021 WL 1234499, at *6. This court reasoned that the FAC also plausibly alleged that even if she did not know about the February 14, 2012 Family Court Order when she prepared the Petition, she knew about it soon thereafter. *Id.* And the FAC alleged that, with knowledge of Keahiolalo's lack of custody or other rights regarding B.D., "Kaulukukui knowingly assisted in the wrongful removal of B.D. from David's custody in violation of Plaintiffs' rights to familial association." *Id.* The Ninth Circuit subsequently affirmed the denial of qualified immunity, rejecting Kaulukukui's interlocutory appeal. *See David II*, 38 F.4th at 804.

---

[17] A defense of qualified privilege also exists under Hawaii law. As reiterated in *David I*, "[u]nder Hawaii law, it is well established that a nonjudicial government official performing a public duty enjoys the protection of a qualified privilege against certain state torts." 2021 WL 1234499, at *7 (citations and internal brackets omitted). "But the official loses the qualified privilege if 'in exercising [her] authority [she] is motivated by malice, and not by an otherwise proper purpose.'" *Id.* (quoting *Medeiros v. Kondo*, 55 Haw. 499, 503, 522 P.2d 1269, 1271 (1974)). Thus, "[f]or a tort action to lie against a nonjudicial government official, the injured party must allege and demonstrate by clear and convincing proof that the official was motivated by malice and not by an otherwise proper purpose." *Id.* (citation omitted).

In those prior proceedings, this court emphasized that it was ruling assuming the truth of the allegations of the FAC, and that Kaulukukui "might ultimately be entitled to qualified immunity . . . [at] the summary judgment stage . . . [when] the court is presented with facts providing context for the challenged actions." *David I*, 2021 WL 1234499, at \*7 (citations omitted).  The Ninth Circuit likewise reasoned that Kaulukukui "may ultimately prove that David's allegations are false," but affirmed the denial of qualified immunity because it "must accept all well pleaded factual allegations as true." *David II*, 38 F.4th at 804.

We are now at that summary judgment stage.  Nevertheless, upon close examination of the evidence in the record on all the pending motions, the court is still unable to grant qualified immunity (or a qualified privilege under Hawaii law) to Kaulukukui because the evidence is disputed on key issues—whether or when did she know that Keahiolalo had no custody or other rights to B.D., and whether her role (if any) in removing B.D. from David *and* placing B.D. with Keahiolalo was reasonable in light of her (disputed) knowledge at relevant times.

### 2.     *Application of Qualified Immunity Standards to Kaulukukui*

Applying the two-prong test for qualified immunity, and given prior proceedings, it is now undisputed that federal constitutional rights "particularized

40

to the facts of the case," *Rieman*, 96 F.4th at 1092, were clearly established at

relevant times in 2019.  Specifically, it was

> clearly established before 2019 that the rights of parents
> and children to familial association under the Fourteenth,
> First, and Fourth Amendments are violated if a
> government official removes children from their parents
> without their consent, and without a court order, unless
> information at the time of the seizure, after reasonable
> investigation, establishes reasonable cause to believe that
> the child is in imminent danger of serious bodily injury,
> and the scope, degree, and duration of the intrusion are
> reasonably necessary to avert the specific injury at issue.

*David I*, 2021 WL 1234499, at *5 (brackets omitted) (quoting *Keates v. Koile*, 883

F.3d 1228, 1236 (9th Cir. 2018)).  As *David II* recognized, "[t]he interest of

parents in the care, custody, and control of their children is perhaps the oldest of

the fundamental liberty interests recognized by the Supreme Court."  38 F.4th at

799 (brackets omitted); *see also Scanlon v. Cnty. of L.A.*, 92 F.4th 781, 797–98

(9th Cir. 2024) (reiterating standards).

And *David II* further explained that it was clearly established that "as

part of the right to familial association, parents and children have a 'right to be free

from judicial deception' in child custody proceedings and removal orders."  38

F.4th at 800 (quoting *Greene v. Camreta*, 588 F.3d 1011, 1034 (9th Cir. 2009),

*vacated in part and remanded in part*, 563 U.S. 692 (2011)).  "'Judicial deception'

consists of either 'deliberate omission or affirmative misrepresentation.'"  *Scanlon*,

92 F.4th at 799 (citing *David II*, 38 F.4th at 801 n.3).  "To state a violation of the

constitutional right to familial association through judicial deception, a plaintiff must allege '(1) a misrepresentation or omission (2) made deliberately or with a reckless disregard for the truth, that was (3) material to the judicial decision.'" *David II*, 38 F.4th at 801 (quoting *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1147 (9th Cir. 2021)).  "A misrepresentation or omission is 'material' if a court 'would have declined to issue the order had [the defendant] been truthful.'" *Id.* at 1148 (alteration in original) (quoting *Greene*, 588 F.3d at 1035).[18]

With one prong of the qualified immunity analysis established, the analysis centers on the other prong: whether there was a violation of the clearly established rights of familial association or right to be free from judicial deception in removal or custody orders.  That is, for purposes of qualified immunity at this summary-judgment stage, the court examines the evidence and asks whether there are genuine issues of fact as to whether Kaulukukui had "reasonable cause to believe that [B.D. was] in imminent danger of serious bodily injury, and [that] the scope, degree, and duration of the [removal] was reasonably necessary to avert the [harm]."  *Keates*, 883 F.3d at 1238.  The court also considers disputes as to

---

[18]  These federal rights were clearly established in 2019, even if there might be some question whether the contours of *Hawaii* law were uncertain—for example, whether a Petition for Protection that precluded contact between a parent and child by itself was sufficient to authorize removal of a child.  Nevertheless, even if *Hawaii* law was not clearly established in 2019, "the focus of § 1983 is federal law, not state law."  *Stanley v. Gallegos*, 852 F.3d 1210, 1214 (10th Cir. 2017) (asking rhetorically "[w]hy should qualified immunity under [§ 1983] depend on whether the government employee complied with state law?").

whether Kaulukukui made deliberate or reckless material misrepresentations or omissions during the process of removing B.D. from her mother and placing B.D. with Keahiolalo.  *See David II*, 38 F.4th at 801.

There is much evidence indicating that it was entirely reasonable for Kaulukukui and others to believe B.D. was in imminent danger of harm.  Evidence substantiates that David behaved erratically and dangerously on both November 29, 2019, at the shopping center and especially on November 30, 2019, at the fire station.  *See, e.g.*, ECF No. 329-1 at PageID.2661–2664; ECF No. 331-11 at PageID.2783–2788.  From the court's review, the video of the November 30, 2019 fire station incident where David assaults Keahiolalo in front of B.D. is disturbing and bizarre.  *See* ECF No. 331-12.  Police reports reviewed by Kaulukukui plainly stated that "[b]ased on the statements and video obtained during the investigation on 11/30/19 Hannah David inflicted bodily injury to William Keahiolalo while in the presence of their daughter [B.D.] (10 years old) thus committing the offense of Abuse of a Family or Household Member (felony) HRS 709-0906."  ECF No. 331-11 at PageID.2785; *see also* HRS § 709-906(10) ("Where physical abuse occurs in the presence of a minor . . . and the minor is a family or household member less than fourteen years of age, abuse of a family or household member is a class C felony.").  David threatened not only Keahiolalo, but also his wife and children.  *See, e.g.*, ECF No. 403-1 at PageID.3865; ECF No. 378-8 at PageID.3632.  And it

43

is undisputed that David was arrested and charged with assault and abuse of a family member based on that incident (and she pled no contest to assault on December 16, 2020).  *See* ECF Nos. 329-5 and 329-6.[19]

Given this evidence, there clearly was justification to file some sort of Petition for Order for Protection, and there was sufficient evidence to remove B.D. from David's custody at that time, at least temporarily, without a court order under the procedures set forth in HRS §§ 587A-8 and 587A-9.  That is, there was "reasonable cause to believe that [B.D. was] in imminent danger of serious bodily injury."  *Keates*, 883 F.3d at 1236.  Likewise, this evidence supports the view that Kaulukukui was motivated by nothing more than a concern for the safety of Keahiolalo, his family, and B.D.  *See also* ECF No. 329-1 at PageID.2669.  A jury could certainly believe that she was simply attempting to do her job as she perceived the circumstances to have been.  *See, e.g.*, *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (reiterating that "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" and protects "'all but the plainly incompetent or those who knowingly violate the law'") (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

---

[19]  Indeed, David later *agreed* in a Family Court proceeding that "[B.D.] is a child whose physical or psychological health or welfare has been harmed or is subject to threatened harm by . . . a threat of psychological harm and lack of appropriate supervision as to Ms. David."  ECF No. 331-15 at PageID.2811.

Nevertheless, there are open questions of material fact about whether or when Kaulukukui knew about Keahiolalo's custody or other rights (or lack thereof) as to B.D.[20]  Such knowledge would have impacted her ability (1) to prepare and file a Petition for Order of Protection by Keahiolalo on behalf of B.D., and (2) to direct that B.D. be placed in his custody after removal from David.  It is important to recognize that there are at least two distinct (but related) actions to analyze: (1) Kaulukukui's decision to file (or assist Keahiolalo with) the December 4, 2019 Petition for Protection not only on behalf of Keahiolalo *but also on behalf of B.D.* which would restrain David from contact with B.D.; and (2) her decision to advocate for—or direct—the removal of B.D. from David *and place her with*

---

[20]  The court agrees with Kaulukukui's argument in her Reply that Plaintiffs' Responsive Concise Statement of Facts in support of their Opposition is inconsistent with Local Rule 56.1 because Plaintiffs failed to attach to its opposition papers much of the specific evidence necessary to create questions of fact.  *See* ECF No. 391 at PageID.3771.  Instead, Plaintiffs largely refer to documents and arguments filed in relation to *other* motions.

Nevertheless, given that the court is analyzing multiple motions all at once with overlapping issues and evidence, the court will consider all the truffles it has found in the record.  *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("[J]udges are not like pigs, hunting for truffles." (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

The court disagrees, however, with Kaulukukui's argument challenging certain documents because Plaintiffs failed to authenticate them.  *See* ECF No. 391 at PageID.3773 (arguing that "[a] court cannot consider unauthenticated documents in a motion for summary judgment") (citing *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002)).  But the *Orr* standard, requiring evidence to be authenticated and admissible in its present form for it to be considered at the summary-judgment stage, was abrogated in 2010 by amendments to Federal Rule of Civil Procedure 56.  *See, e.g.*, *S&G Labs Haw., LLC v. Graves*, 2021 WL 621429, at *14 n.15 (D. Haw. Feb. 17, 2021) ("*Orr* was superseded on other grounds by the 2010 amendments to Fed. R. Civ. P. 56.") (citing *Dinkins v. Schinzel*, 362 F. Supp. 3d 916, 922–23 (D. Nev. 2019)).  Instead, Rule 56 "mandate[s] only that the *substance* of the proffered evidence would be admissible at trial."  *Dinkins*, 362 F. Supp. 3d at 923 (citing cases).

*Keahiolalo*.  *See, e.g.*, ECF No. 329-1 at PageID.2667 (Kaulukukui attesting that she told Kauai police on December 18, 2019 that "[B.D.] needs to be removed from her mother's care and placed with her father . . .").

For instance, although Kaulukukui attests that Keahiolalo never told her about the February 14, 2012 Family Court Order, and that she never saw it until her deposition in this case, ECF No. 329-1 at PageID.2664, 2669,[21] there is evidence that she knew at relevant times that Keahiolalo had no custody rights. According to a November 30, 2019 police report, Keahiolalo specifically *told* Kauai police that "I have not seen my daughter since she was three years old" and that David "had full custody of [B.D.] and there is not (sic) TRO or any kind of order that I know of in place."  ECF No. 331-11 at PageID.2783; *id*. at PageID.2788 (police report stating "Keahiolalo verbally reported the following (paraphrased): . . . Hannah has full custody of [B.D.] and they live on the Big Island [and] I haven't seen either of them for several years . . . .").[22]  This is the same police report that Kaulukukui admits reading and relying on, in part, to prepare the December 4, 2019 Petition.  *Compare* ECF No. 329-1 at PageID.2661–

---

[21]  Keahiolalo also testified at his deposition he did not show Kaulukukui a copy of the February 14, 2012 Family Court Order, or speak about it.  *See* ECF No. 329-7 at PageID.2684.

[22]  Kaulukukui testified at her deposition that she did not ask Keahiolalo about custody, although she thought he had custody and believed he was entitled to seek the TRO on B.D.'s behalf on December 4, 2019, because "she is his daughter."  *See* ECF No. 378-5 at PageID.3618.

2662 *with* ECF No. 331-11 at PageID.2785.[23]  *See also* ECF No. 378-1 at PageID.3602–3603 (Keahiolalo attesting "Kaulukukui knew that I had to withdraw my custodial case and had given up my rights to any legal custody or scheduled visitation").  Based on those police reports and the December 4, 2019 TRO, she told Kauai police on December 18, 2019 that "[B.D.] needs to be removed from her mother's care and placed with her father until the court makes a decision on custody."  ECF No. 329-1 at PageID.2667; *see also* ECF No. 335-15 at PageID.3025 (CWS report of December 19, 2019 stating that "[Kaulukukui] left message on 12-18 . . . [saying] HPD on Big Island should PC the child and return her to dad on Kauai.").[24]

---

[23]  Although more than one police report was submitted to the court, *see* ECF No. 331-11 (containing two separate reports), in her declaration Kaulukukui refers to a report stating, in part, that "[b]ased on the statements and video obtained during the investigation on 11/30/19 Hannah David inflicted bodily injury to William Keahiolalo . . . ."  That same report, set forth at ECF No. 331-11 at PageID.2781-2785, also contains a paraphrased summary of Keahiolalo's statement to the police, to include that he had not seen B.D. since she was three years old and that David had full custody of B.D.  In short, this is evidence construed in the light most favorable to Plaintiffs that Kaulukukui was aware that Keahiolalo did not have custody of B.D.

[24]  Among other assertions, Keahiolalo attested on November 13, 2023, in his Opposition to Kaulukukui's Motion that "[i]t was Kaulukukui that suggested that B.D. be added to the TRO, which I did not know was an alternative."  ECF No. 378-1 at PageID.3602.  But this assertion flatly contradicts Keahiolalo's earlier deposition testimony on June 7, 2023, that it was his idea to "put [B.D.] on to [the TRO] paperwork."  ECF No. 395-2 at PageID.3814.  Specifically, the following exchange occurred at Keahiolalo's deposition:

> Q. (to Keahiolalo):  Your testimony earlier today was that it was Gina [Kaulukukui] who prepared the paperwork to request a temporary restraining order; is that correct?
>
> A. (Keahiolalo):  Yes.

(continued . . . )

And so, there is conflicting evidence of Kaulukukui's knowledge of whether Keahiolalo had any right to seek protection of B.D. from David, and whether he had any right to take custody of B.D. after she was restrained from having contact with David.[25]  This is a genuine dispute of material fact because

---

> Q.:  Whose idea was it to put [B.D.] on to that paperwork?
>
> A.:  My idea.

*Id.*

Given that deposition testimony, the court agrees with Kaulukukui's argument that the statement in Keahiolalo's declaration ("[i]t was Kaulukukui that suggested that B.D. be added to the TRO") should be stricken as a "sham."  *See, e.g.*, *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.") (citations omitted).  "This sham affidavit rule prevents 'a party who has been examined at length on deposition' from 'raising an issue of fact simply by submitting an affidavit contradicting his own prior testimony . . . .'"  *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (brackets omitted) (quoting *Kennedy*, 952 F.2d at 266).  Keahiolalo has not attempted to explain or resolve the clear contradiction.  *See, e.g.*, *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) (explaining limitations on the sham affidavit rule).  And so, the court agrees with Kaulukukui that the statement cannot be used to create an issue of fact.

Nevertheless, even without that statement, other evidence as explained above creates a genuine issue of material fact precluding summary judgment in favor of Kaulukukui.  In any event, ultimately it matters little whether it was Keahiolalo's idea to add B.D. to the TRO, or whether Kaulukukui suggested it first.  What matters is that she prepared it and filed it on his behalf, and sought to restrain David from contact with B.D.

[25]  Questions of fact exist even without considering the Declaration of Cynthia Garcia.  *See* ECF No. 335-26.  Garcia is David's mother, and grandmother of B.D.  *Id.* at PageID.3050.  She proffered a declaration in support of David stating, among other things, that—back in February of 2012—she told Kaulukukui that "[y]ou know we won; Hannah [David] got full custody."  *Id.* at PageID.3051.  She attests that this was after the February 14, 2012 Family Court hearing, which is a hearing that resulted in the February 14, 2012 Family Court Order.

Kaulukukui, however, has filed a Motion to Strike Garcia's Declaration, ECF No. 352, which the court GRANTS.  Kaulukukui's Motion to Strike establishes that David failed to timely disclose Garcia as a witness during discovery, either initially or in a supplemental disclosure, in violation of Federal Rule of Civil Procedure 26(a)(1)(A)(i).  *See* ECF No. 352-11 at PageID.3131–3132; ECF No. 352-2 at PageID.3139.  And Rule 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or

(continued . . . )

48

making either (or both) of those decisions would properly require knowledge of Keahiolalo's custody rights.

Kaulukukui argues that "it has never been [her] position that [Keahiolalo's] custody and visitation rights were material to the domestic violence protective order petition she assisted him with filling out and filing." ECF No. 393 at PageID.3789. Nevertheless, she testified at her deposition that she thought at the time that Keahiolalo had custody, but she filed the petition on B.D.'s behalf because Keahiolalo was her father. *See* ECF No. 378-5 at PageID.3618. She points out that HRS § 586-3 does not mention custody in defining who may make a petition for an order for protection.[26] ECF No. 393 at PageID.3789. But, even if a

---

at a trial, unless the failure was substantially justified or is harmless." *See, e.g., Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) ("Rule 37(c)(1) gives teeth to these requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed."). In response, Plaintiffs have not demonstrated that the failure to identify Garcia was "substantially justified or harmless" for purposes of Rule 37(c)(1), and they state that Garcia "is not expected to testify in Plaintiff's case-in-chief and will likely testify in the trial of this case only as a rebuttal witness . . . ." ECF No. 355 at PageID.3147. So, to be clear, the court has not considered Garcia's Declaration in denying Kaulukukui's Motion for Summary Judgment.

[26] HRS § 586-3 (titled "Order for protection") provides in pertinent part:

> (b)  A petition for relief under this chapter may be made by:
>     (1)  Any family or household member on the member's own behalf or on behalf of a family or household member who is a minor . . . .

In turn, a "family or household member" means, in pertinent part:

> spouses or reciprocal beneficiaries, former spouses or former reciprocal beneficiaries, persons who have a child in common,

(continued . . . )

jury could find that Kaulukukui did not deliberately conceal information regarding

custody in the December 4, 2019 Petition, a jury could still find she acted with

"reckless disregard for the truth." *David II*, 38 F.4th at 801.  Moreover, omitting

such information about custody certainly appears to have been material for

purposes of the judicial deception analysis (even if *she* did not think it was

material).  The omission was the precise basis for the Family Court Judge's

December 31, 2019 dissolution of the December 4, 2019 TRO as to B.D. only.  *See*

ECF No. 335-3 at PageID.2906; ECF No. 335-4 at PageID.2910 (Family Court

concluding that "William Keahiolalo did not have legal authority to file the

Petition on behalf of [B.D.]").  The Family Court Judge also questioned the

omission of information in part 8 of the Petition regarding "Other court cases."

*See* ECF No. 335-4 at PageID.2908 (referring to paragraph 8 of the December 4,

2019 Petition (*see* ECF No. 403-1 at PageID.3867)).  Omission of that information

regarding prior custody proceedings might also form the basis of a judicial

deception claim.

       In short, much turns on whether or when Kaulukukui knew that David

had all custody rights and that Keahiolalo had none.  There are thus questions of

---

                  parents, children, persons related by consanguinity, persons jointly
residing or formerly residing in the same dwelling unit, and
persons who have or have had a dating relationship . . . .

HRS § 586-1.

fact as to whether Kaulukukui violated David's and B.D.'s rights of familial association and to be free from judicial deception in B.D.'s removal.  *See David II*, 38 F.4th at 799–801 (explaining contours of the constitutional rights).  Such disputes of fact preclude a grant of qualified immunity on summary judgment.  *See Estate of Lopez by and through Lopez v. Gelhaus*, 871 F.3d 998, 1021 (9th Cir. 2017) ("Because [defendant's] entitlement to qualified immunity ultimately depends on disputed factual issues, summary judgment is not presently appropriate.") (citations omitted).

Likewise, for purposes of the state law claim in Count III, it follows in this case that there are questions of fact as to whether Kaulukukui was "motivated by malice" for purposes of a qualified privilege under Hawaii law.  *See Medeiros*, 55 Haw. at 503 (explaining defense of qualified privilege against certain Hawaii torts).  A denial of qualified immunity under federal law is often, although not always, indicative of a lack of qualified privilege under Hawaii law.  *Cf. Ikeda v. City & Cnty. of Honolulu*, 2019 WL 4684455, at *9 (D. Haw. Sept. 25, 2019) ("[H]aving concluded that [the officer defendant] is not entitled to qualified immunity [under federal law]. . . it follows that the facts alleged are sufficient to support a finding of 'malice' [under state law] in that a jury could conclude that [the officer] acted with 'reckless disregard of the law or of a person's legal

rights.'") (quoting *Awakuni v. Awana*, 115 Haw. 126, 141, 165 P.3d 1027, 1042 (2007)).[27]

Accordingly, the court DENIES Kaulukukui's Motion for Summary Judgment.

## D.   The Individual CWS Defendants' Motion for Summary Judgment

Next, the Individual CWS Defendants (Leskovic, Kaauwai-Herrod, Cho, and San Augustine) move for summary judgment on all three Counts brought against them by Plaintiffs.  ECF No. 330.  They also seek summary judgment as to a crossclaim brought against them by Keahiolalo.  See ECF No. 330-1 at PageID.2720, 2725.  The court addresses each Count of the FAC in turn, and then addresses Keahiolalo's crossclaim.

### 1.   *Violations of Section 1983 (Count I)*

As to the violation of civil rights claim brought by Plaintiffs, the Individual CWS Defendants argue that they have qualified immunity, or in any event, did not violate Plaintiffs' constitutional rights.

The court applies the same framework here that it applied to Kaulukukui's Motion.  That is, in assessing qualified immunity the court considers

---

[27] Kaulukukui has not argued that she lacks "malice" for purposes of a state-law qualified privilege because Hawaii law is unsettled as to whether a TRO restraining contact between a parent and child (such as the December 4, 2019 TRO at issue here) is sufficient to remove a child temporarily—without resorting to HRS § 587A-8.

two prongs (in either order):  (1) whether an official violated a constitutional right; and (2) whether that right was clearly established at the time of the alleged misconduct.  *See, e.g.*, *Rieman*, 96 F.4th at 1092.  And where multiple defendants invoke qualified immunity "the court must analyze whether the facts pertaining to each defendant . . . support [a plaintiff's] claims of constitutional violations." *Handt v. Lynch*, 681 F.3d 939, 945 (8th Cir. 2012); *see also, e.g.*, *Dodds v. Richardson*, 614 F.3d 1185, 1194 (10th Cir. 2010) ("In conducting qualified immunity analysis . . . , courts must consider . . . whether *each* defendant's alleged conduct violated the plaintiff's clearly established rights.") (emphasis added) (quoting *Hope v. Pelzer*, 536 U.S. 730, 751 n.9 (2002) (Thomas, J., dissenting)); *Bishop v. Hackel*, 636 F.3d 757, 769 (6th Cir. 2011) ("Determining whether a defendant is entitled to qualified immunity requires an individual assessment of the knowledge of that defendant.").

As with Kaulukukui's Motion, one prong of the test is satisfied:  The FAC implicates constitutional rights that were clearly established before 2019.  In particular, at issue is a clearly established federal constitutional right of familial association, which, to repeat, is

> violated if a [government] official removes children from their parents without their consent, and without a court order, unless information at the time of the seizure, after reasonable investigation, establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury, and the scope, degree, and duration of the

> intrusion are reasonably necessary to avert the specific
> injury at issue.

*David I*, 2021 WL 1234499, at *5 (quoting *Keates*, 883 F.3d at 1237–38).  And "as part of the right to familial association, parents and children have a 'right to be free from judicial deception' in child custody proceedings and removal orders."  *David II*, 38 F.4th at 800.  The elements of a judicial deception claim are (1) a misrepresentation or omission (2) made deliberately or with a reckless disregard for the truth, that was (3) material to the judicial decision.  *Id.* at 801.

With one prong satisfied, the analysis shifts to the other prong—whether there is evidence that each Individual CWS Defendant violated those clearly established rights.  As to the right to be free of judicial deception in child custody proceedings or removal orders, there are two such proceedings involved in this case—the December 4, 2019 Petition for an Order for Protection, and the January 6, 2020 Petition for Temporary Foster Custody.

For the first, it is undisputed that none of the Individual CWS Defendants had any involvement with preparation of the December 4, 2019 Petition.  *See* ECF No. 331-1 at PageID.2741 (Lescovic); ECF No. 331-2 at PageID.2747 (Cho); ECF No. 331-3 at PageID.2751–2752 (Kaauwai-Herrod); ECF No. 331-4 at PageID.2756 (San Augustine); ECF No. 365 at PageID.3419 (admission by Plaintiffs that "[t]he CWS Defendants had no part in the drafting or seeking of the December 4 petition").  The earliest any of them were informed of

54

the December 4, 2019 TRO was December 16, 2019.  *See, e.g.*, ECF No. 331-1 at

PageID.2741.  None of these Individual CWS Defendants could have had any

responsibility for any alleged material misrepresentation or omission regarding that

December 4, 2019 Petition.

Rather, the focus is on the Individual CWS Defendants' particular

knowledge and involvement with the January 6, 2020 Petition for Temporary

Foster Custody, which began on December 31, 2019, after the Family Court

dissolved the December 4, 2019 TRO as to B.D.  Here, the court examines whether

any Individual CWS Defendant made (1) a misrepresentation or omission

(2) deliberately or with a reckless disregard for the truth, that was (3) material to

the January 6, 2020 Petition for Temporary Foster Custody.

The court also examines the December 20, 2019 removal of B.D. from

David's custody and transfer of B.D. to Keahiolalo.  These events implicate the

more general right of familial association, where the court in this situation

examines whether any Individual CWS Defendant had "reasonable cause to

believe that [B.D.] [was] in imminent danger of serious bodily injury, and the

scope, degree, and duration of the intrusion [were] reasonably necessary to avert

the specific injury at issue."  *Keates*, 883 F.3d at 1238.

a.    *The January 6, 2020 Petition for Temporary Foster Custody*

It is undisputed that Cho and San Augustine were not involved in the decision to proceed under HRS Chapter 587A beginning on December 31, 2019, or to file the January 6, 2020 Petition.  Cho attests that she had no involvement on December 31, 2019, and did not participate in the drafting or filing of any CWS reports or petitions.  *See* ECF No. 331-2 at PageID.2749.  San Augustine likewise attests that he was on leave on December 31, 2019.  *See* ECF No. 331-4 at PageID.2758.  The only Individual CWS Defendants who were involved with the January 6, 2020 Petition are Lescovic and Kaauwai-Herrod, who both had substantial involvement with the January 6, 2020 Petition.  *See, e.g.*, ECF No. 331-1 at PageID.2744; ECF No. 331-3 at PageID.2753–2754; ECF No. 331-14 at PageID.2799; ECF No. 335-16 at PageID.3026; ECF No. 335-17 at PageID.3028.

But, as analyzed when examining Betts' Motion, the undisputed evidence is that CWS personnel and Kauai Police proceeded under HRS §§ 587A-8 and 587A-9 to assume protective custody of B.D. without a court order after the December 31, 2019 hearing in Family Court.  *See* ECF No. 331-13.  And as previously found, the January 6, 2020 Petition for Temporary Foster Custody was timely and based on an objectively reasonable belief of "imminent harm," which the Family Court later confirmed.  *See* ECF No. 331-15 at PageID.2810–2811 (finding that "there is an adequate basis to sustain the Petition for Temporary

56

Foster Custody filed on January 6, 2020 in that [B.D.] is a child whose physical or psychological health or welfare has been harmed or is subject to threatened harm . . . .").  Although there are disputes about when particular Defendants knew about Keahiolalo's lack of custody rights, it is undisputed that the January 6, 2020 Petition gave that information to that Family Court Judge, i.e., that "Father is a non-custodial parent and is unable to have contact with Child due to Mother's TRO."  ECF No. 331-14 at PageID.2798.

There thus is no basis for a claim of judicial deception against any Individual CWS Defendant based on the January 6, 2020 Petition for Temporary Foster Custody.  There is no evidence of a material misrepresentation or omission made to the Family Court with deliberate or reckless disregard for the truth.

> b.  *December 20, 2019 Removal of B.D. and Transfer to Keahiolalo*

Although there is no viable judicial deception claim against the Individual CWS Defendants, there are genuine issues of material fact—for all but Cho—as to Plaintiffs' claim based on the more general deprivation of a right of familial association.

As analyzed earlier in assessing Kaulukukui's Motion, there is substantial evidence to indicate that Individual CWS Defendants could have believed B.D. was in imminent harm on December 20, 2019.  At that time, the December 4, 2019 TRO was still in effect, and had not yet been vacated as to B.D.

As with Kaulukukui, there likely was "reasonable cause to believe that [B.D. was] in imminent danger of serious bodily injury." *Keates*, 883 F.3d at 1236.  The evidence supports the position that the Individual CWS workers were motivated by nothing more than a concern for the safety of B.D.  *See, e.g.*, *Ram v. Rubin*, 118 F.3d 1306, 1311 (9th Cir. 1997) ("A state official cannot remove children from their parents unless the official has a reasonable belief that the children are in imminent danger.  An indictment or serious allegations of abuse which are investigated and corroborated usually gives rise to a reasonable inference of imminent danger sufficient to justify taking children into temporary custody.") (citation omitted).

Nevertheless, as with the importance of Kaulukukui's knowledge of Keahiolalo's custody rights (or lack thereof) in analyzing Kaulukukui's Motion, a key question is whether there is evidence that any Individual CWS Defendant knew (and, if so, when they knew) that Keahiolalo had no custody rights.  Such knowledge is important in analyzing the scope of their involvement with the decision to remove B.D. from David's custody at the elementary school, and then transfer B.D. to Keahiolalo's custody.  And such knowledge is especially significant given the Individual CWS Defendants' position that CWS did not take custody of B.D. on December 20, 2019, but rather "transferred" B.D. from David

to Keahiolalo. *See, e.g.*, ECF No. 330-1 at PageID.2714; ECF No. 387 at PageID.3726.

Here, when specifically analyzing the placement of B.D. with Keahiolalo on December 20, 2019—as distinct from simply removing B.D. from David—the court focuses on whether there was "reasonable investigation," and whether "the scope, degree, and duration of the intrusion [was] reasonably necessary to avert the specific injury at issue." *Keates*, 883 F.3d at 1238; *see also Scanlon*, 92 F.4th at 798 (reiterating familial association analysis). Knowledge of custody rights is important in assessing whether the "duration" (the 13 days from December 20, 2019 until January 3, 2020), the "scope" (transfer or placement with Keahiolalo), and the "degree" of removal (e.g., placement with Keahiolalo in lieu of foster care under HRS 587A), were disproportionate and reasonably necessary to avert the harm.

Initially, Keahiolalo attests that "[d]uring the early contacts with CWS, I openly shared the existence of the [February 14, 2012] Stipulation with [former Individual CWS Defendant] Sean Lathrop and that David had sole legal and physical custody." ECF No. 377-1 at PageID.3561. So there certainly is evidence that CWS, at least through Lathrop, knew about the February 14, 2012

Family Court Order.[28]  And there is evidence that Lathrop was also meeting or discussing matters with Leskovic, and/or Kaauwai-Herrod during relevant time frames.  *See* ECF Nos. 335-15 and 335-16.

       1)    Amy Lescovic

Lescovic is a CWS social worker who worked in the West Hawaii office of the DHS from July 2019 to March 2020.  *See* ECF No. 331-1 at PageID.2740.  She was assigned by her supervisors Lathrop and Toscano on December 16, 2019, as the lead social worker after CWS received an intake report regarding the December 4, 2019 TRO and the arrest of David for assaulting

---

[28] Lathrop disputes much of that statement.  He testified at his deposition:

> [On December 17, 2019, Keahiolalo] stated [to me] that mother had full custody but he had court-ordered visitations that mother had been denying him.
>
>     He also stated at that time that he had been in contact with the child several times previously that year, as early as August of that year.  He also stated at that time that mother had reached out to him requesting assistance with housing and other things like that.
>
>     I asked him if he had any kind of actual legal documentation regarding custody.  He said that he had folders and folders of documents.  I asked him to provide the most recent court orders of any kind relating to custody, and I asked him if he could provide those to us as soon as possible.
>
>     . . . .
>
>     I asked him for any documents to support his claims.  He did not provide them.

ECF No. 390-2 at PageID.3764.  Lathrop also testified that "[t]he copy of this document [the February 14, 2012 Family Court Order] was provided to us by Deputy Attorney Generals after the lawsuit had been filed."  *Id.*

Keahiolalo.  *Id.* at PageID.2741.  Lescovic interviewed B.D. at her school, and

David at her home, on December 18, 2019, on the Big Island.  *See, e.g.*, ECF No.

331-1 at PageID.2742.  Among other matters, Lescovic prepared a risk assessment

on David on December 19, 2019, ECF No. 335-19 at PageID.3030, and later

prepared a child safety assessment for B.D. on January 3, 2020, ECF No. 335-22 at

PageID.3035.

   As to knowledge of custody, during her interview David told Lescovic

that David had full custody of B.D. based on "a 21 year Protection Order that was

issued in 2013 [and that] states dad can not be around . . . their child."  ECF No.

335-12 at PageID.3020.  David then told her "[David] has full legal physical

custody with prejudice [which] means he can never come back and change the

paperwork . . . ."  *Id.*  Prior to interviewing B.D. at her school, Lescovic contacted

the school's Principal and was told, among other things, that "[B.D.'s] father is

William and he has a TRO."  ECF No. 335-14 at PageID.3022.  And (whether or

not Lescovic read it) the school's "emergency card" for B.D. states:

> 9/8/15 - Mother (Hannah David) has sole legal and
> physical custody of [B.D.].  William Butch Keahiolalo is
> prohibited from having any contact with child ([B.D.]).
> Legal Doc. on file.

*Id*. at PageID.3024.

   Additionally, other evidence suggests Lescovic may have been aware

of the importance of custody issues.  ECF No. 335-15 at PageID.3025 ("[Hawaii]

PD Officers stated TRO father filed on 12-4-19 is not valid because mom was not served. . . .  HPD told her to report to Kauai PD that father violated her 21[-]year TRO and he will definitely be arrested because it is a court document . . . ."); ECF No. 335-16 at PageID.3027 (December 17, 2019 email from Lathrop with copy to Leskovic stating "[w]e are still trying to figure out what to do with this case [as] it involves a TRO, custody issues and it's not clear why we would be taking custody").  There is thus evidence that Lescovic knew or should have known that Keahiolalo had no right to have custody or contact with B.D.  In contrast, Lescovic attests that when she spoke with Keahiolalo, he "informed me that he retained visitation with B.D.," ECF No. 331-1 at PageID.2741.  Given conflicting evidence, there are genuine issues of material fact as to Lescovic's knowledge.

2)      Iwalani Kaauwai-Herrod

There are also questions of fact as to whether Kaauwai-Herrod—a CWS social worker on Kauai—had specific knowledge of Keahiolalo's custody rights at relevant times.  She appears to have first become involved in the events of this case on December 19, 2019, when she was contacted by San Augustine who requested her help.  *Id.* at PageID.2752.  Most of the evidence of Kaauwai-Herrod's knowledge of Keahiolalo's custody rights occurs after December 20, 2019.  *See, e.g.*, ECF No. 335-16 at PageID.3026; ECF No. 335-17 at PageID.3028.  At minimum, however, there is evidence that Kaauwai-Herrod had

been alerted—prior to B.D.'s removal on December 20, 2019—that there was uncertainty about whether Keahiolalo had any right to have custody of B.D.  She attests that on December 20, 2019, the Kauai Police Department contacted her "regarding concerns they had that David had full legal and physical custody of B.D."  ECF No. 331-3 at PageID.2752.  She also admits that on December 19, 2019, she spoke with San Augustine who had "requested copies of pertinent custody documents from Keahiolalo," *id.*, indicating possible knowledge of a concern about custody rights.  Although she contends that she had no knowledge of the specific February 14, 2012 Family Court Order until this litigation began, *see* ECF No. 331-3 at PageID.2754, her knowledge remains a question of fact.

3)    Dino San Augustine

There are also questions of fact as to San Augustine.  He has been employed by the Kauai office of CWS since June 2019.  ECF No. 331-4 at PageID.2755.  He visited Keahiolalo's home on December 17, 2019, to perform a safety assessment.  *See id*. at PageID.2756.  During that home visit he "discussed the issue of B.D.'s custody with Keahiolalo."  *Id.*  His knowledge of custody is particularly important because he appears to have been involved with CWS's position that CWS was not taking "custody" of B.D. on December 20, 2019, and was not "placing" B.D. with Keahiolalo, but was instead transferring or "returning" custody from David to Keahiolalo.  *See* ECF No. 335-9 at

63

PageID.2984 (Keahiolalo stating that after December 16, 2019 "Dino later visited our residence to perform a safe home check . . . .  During this visit Dino repeatedly stated that this was not a placement [by CWS], it was a return of B.D. since [Keahiolalo] was B.D.'s father").

December 17, 2019 text messages from CWS (apparently from former-Defendant Lathrop) show that CWS was interested in Keahiolalo's custody rights.  CWS asked Keahiolalo on December 17, 2019, for further information about his custody rights:  Someone asked Keahiolalo: "You reported yesterday the mother had filed for full physical and legal custody correct?  In which court did that happen?"  *Id*. at PageID.2984.  Keahiolalo replied "It was on Kauai back in 2010 or 2011 I believe. . . .  Not sure what documents I can provide but I do have a lot of evidence from the last court case where I fought for custody."  *Id*.  When CWS followed up later on December 17, 2019, seeking further information about the "October 2011" custody case, Keahiolalo stated:

> Ok I'll dig it up.  Deano [San Augustine] the social worker said go to 19-1-0287.  That's the FC-DA number. Everything is attached.  All the orders.  [Dino's] here now.  Cases all on Kauai.  If not let me know.

*Id*. at PageID.2985.  This text-message evidence raises a question about San Augustine's knowledge—on December 17, 2019—of B.D.'s custody rights.

Furthermore, there is evidence that San Augustine was very involved with the December 20, 2019 incident after B.D. arrived with Keahiolalo on Kauai

64

on that day.  *See id*. at PageID.2987–2988.  At one point, Keahiolalo texted

someone—apparently, San Augustine—on December 20, 2019:

> Meeting CWS and Police at school to pick up [B.D.].  No
> processing.  A grab and go I was told.

*Id*. at PageID.2988.  San Augustine replied:

> Please let me know when you are here on Kauai.  I need
> to see [B.D.] & you.  Mahalo, safe travels home.

*Id.*

There are thus questions of material fact as to San Augustine, in

particular as to his knowledge of Keahiolanlo's custody rights to B.D. during the

period of her removal from David and placement or transfer of custody to

Keahiolalo.

4)    Penny Cho

Cho, however, is entitled to summary judgment (or qualified

immunity) because there is no evidence that she could have violated either

Plaintiff's right of familial association.  Cho is an "assessment worker" who was

employed by CWS in its West Hawaii office from 1991 to 2008, and from 2017 to

January 2022.  *See* ECF No. 331-2 at PageID.2746.  Cho did little if anything

during the events relevant to this case other than accompany Lescovic to B.D.'s

school on December 20, 2019, and monitor B.D.'s trip with Keahiolalo to the

Kona airport as they flew to Kauai.  *Id.* at PageID.2748.  At most, she was

supposed to (or did) notify San Augustine on Kauai when Keahiolalo and B.D.'s flight left Kona for Kauai.  *See* ECF No. 335-9 at PageID.2987–2988.

There is no evidence that Cho had an investigatory role or any substantive duties regarding B.D.  ECF No. 331-2 at PageID.2747.  She was not involved with preparing the January 6, 2020 Petition for Temporary Foster Custody of B.D., nor in the drafting or filing of any reports regarding custody.  *Id.* at PageID.2749.  She admits speaking to Keahiolalo on December 19, 2019, where he told her what time he would be landing in Kona to pick up B.D.  *Id.* at Page.2748.  But there is no evidence that he told her anything about custody.  *Id.*

David submitted a declaration stating that her attorney spoke with Cho by telephone after the December 31, 2019 Family Court hearing on Kauai, and Cho told David's attorney that CWS would not be taking custody of B.D.  *See* ECF No. 335-24 at PageID.3043.  David further stated that, after that call, a police officer told David's attorney that "he had just been informed that CWS was taking custody of B.D."  *Id.*  David's attorney called Cho again, who then confirmed that CWS was in fact going to take immediate custody of B.D.  *Id.*  Assuming the truth of David's declaration, nothing indicates that Cho was doing anything but answering phone calls and relaying information.  The evidence does not suggest a

violation of a constitutional right of familial association.[29]  In short, Cho is entitled to summary judgment in her favor as to Count I.

### 2.    *Federal Civil RICO Claim (Count II)*

The court turns to the civil RICO claim against the Individual CWS Defendants.  As set forth when addressing Defendant Iseri's Motion, Plaintiffs must show as to the Individual CWS Defendants, among other elements, a criminal "enterprise" and a "pattern" of "racketeering activity."  *Puana*, 2023 WL 374064, at *4.  They must also demonstrate that any harm "qualifies as injury to his business or property" that was "by reason of the RICO violation."  *Id.*  And the "racketeering activity" requires two or more "predicate acts" (a laundry list of federal criminal statutes, and certain state law criminal statutes).  *RJR Nabisco, Inc.*, 579 U.S. at 330.

As with Defendant Iseri's Motion, Plaintiffs have failed—at minimum—to produce any evidence of loss to "business or property" for purposes of RICO standing, or of an "enterprise," or of a pattern of racketeering activity.

---

[29]  Plaintiffs submitted portions of Cho's deposition, *see* ECF No. 335-7, but did not point to any testimony in the deposition to support an argument that she violated a constitutional right. Nevertheless, the deposition indicates that Cho did not know what custody rights Keahiolalo had, and that she was simply following instructions from her supervisors.  *See id.* at PageID.2951–2953.  Most of the deposition indicates that Cho does not remember details of the incident, and that she was unaware of specific constitutional legal principles or police procedures regarding removal of children from parents such as HRS § 587A-8.  *See id.* at PageID.2945–2949. Nothing in the deposition creates a genuine issue of material fact that Cho violated a constitutional right of familial association.

Plaintiffs simply characterize the circumstances of B.D.'s removal from David's custody as a "kidnapping" that involved several of the Defendants. But, under § 1961, a predicate act of "kidnapping" would have to be "chargeable under State law," and Plaintiffs have not argued—much less submitted any evidence—that *any* Defendant met any of the intent elements set forth in Hawaii's kidnapping statute, HRS § 707-720.[30] There plainly is insufficient evidence to create an issue of material fact for Plaintiffs to maintain a civil RICO claim.[31]

### 3.   *Immunity Under HRS § 350-3(b)*

The Individual CWS Defendants also invoke statutory immunity under HRS § 350-3(b) in seeking summary judgment as to the negligence/NIED

---

[30]  HRS § 707-720 provides in pertinent part:

(1)  A person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to:
   (a)  Hold that person for ransom or reward;
   (b)  Use that person as a shield or hostage;
   (c)  Facilitate the commission of a felony or flight thereafter;
   (d)  Inflict bodily injury upon that person or subject that person to a sexual offense;
   (e)  Terrorize that person or a third person;
   (f)   Interfere with the performance of any governmental or political function; or
   (g)  Unlawfully obtain the labor or services of that person, regardless of whether related to the collection of a debt.

[31]  For the same reasons, the court dismisses the civil RICO count against Keahiolalo. *See, e.g.*, *Silverton*, 644 F.2d at 1345 ("A [d]istrict [c]ourt may properly on its own motion dismiss an action as to defendants who have not moved to dismiss where such defendants are in a position similar to that of moving defendants . . . .").

claim against them in Count III.  Section 350-3 titled "Immunity from liability"

provides in pertinent part:

> (b) Any individual who assumes a duty or responsibility pursuant to section 350-2 or chapter 587A shall have immunity from civil liability for acts or omissions performed within the scope of the individual's duty or responsibility.  Nothing in this section shall limit the liability of the department, any other state agency, or any private organization for the conduct of individuals provided immunity herein.

In turn, HRS § 350-2, titled "Action on reporting" refers to actions the

State of Hawaii DHS takes "[u]pon receiving a report concerning child abuse or

neglect," and instructs the Department to "proceed pursuant to chapter 587A and

the department's rules."  HRS § 350-2(a).  And HRS Chapter 587A is Hawaii's

Child Protective Act, HRS §§ 587A-1 to 587A-43, which is a comprehensive law

that "creates within the jurisdiction of the family court a child protective act to

make paramount the safety and health of children who have been armed or are in

life circumstances that threaten harm," and "makes provisions for the service,

treatment, and permanent plans for these children and their families."  HRS

§ 587A-2.  The CWS Defendants argue that all their acts or omissions were

"performed within the scope" of their duties or responsibilities, entitling them to immunity from state-law claims under § 350-3(b).[32]

At oral argument, Plaintiffs' counsel appeared to concede that § 350-3 would bar the state law claims (but not the federal claims).  In their written response, however, Plaintiffs argued that the CWS Defendants were not acting "within the scope of employment," that is "the employee's conduct was [not] related to the employment enterprise or . . . the enterprise derived [no] benefit from the activity."  ECF No. 364 at PageID.3407 (citing *Wong-Leong v. Hawaiian Indep. Refiner, Inc.*, 76 Haw. 433, 879 P.2d 538, 543 (1994)).  They contend that because Defendants' acts "constituted kidnapping," the acts could not have been within the scope of their employment.  *Id.*

Initially, it is unclear whether a general "scope of employment" test is the precise analysis.  The statute provides immunity "for acts or omissions performed within the scope of the individual's duty or responsibility" under HRS "350-2 or chapter 587A"—a different and perhaps narrower test, tied to specific

---

[32] In enacting § 350-3(b) in 1986, the Hawaii Legislature stated that the purpose was "to provide immunity from civil liability for persons acting in good faith, on behalf of and authorized by the Department of Social Services . . . to prevent child abuse and neglect while in the performance of their duties and responsibilities."  S. Comm. Rep. No. 597-86, in 1986 Haw. Senate Journal at 1051.  It found that "[b]ecause of the nature of their duties, social workers are vulnerable to charges of overzealous intrusion on one hand, and lack of aggressive intervention on the other."  *Id.*

statutory actions or provisions.[33]  More importantly—as discussed when

dismissing the civil RICO claims—there was no "kidnapping."  There has never

been a state court finding or even accusation by any prosecutor or law enforcement

official that an element of "kidnapping" has been satisfied.  And construing

Plaintiffs' rhetorical characterization as encompassing all the acts that led to B.D.'s

removal from David's custody, it is apparent from the court's review of the record

that all of the Individual CWS Defendants' acts—even if some were mistaken—

were done within the scope of their duties under § 350-2 or Chapter 587A.

The Individual CWS Defendants were acting with a then-valid court

order (the December 4, 2019 Family Court TRO) that precluded contact between

B.D. and David.  There was ample evidence indicating that B.D. was in "imminent

danger," especially given David's arrest and charge for Abuse of a Family or

Household Member in violation of HRS § 709-906.  *See* ECF No. 329-5.  The

reports and investigations they made regarding temporary foster custody were done

pursuant to § 587A-11.  *See, e.g.*, ECF No. 331-1 at PageID.2744–2745; ECF No.

---

[33]  Although Plaintiffs did not cite any case law in support of their application of a scope-of-employment test, the court is aware of *Haldeman ex rel. Haldeman v. Golden*, 2008 WL 515950, at *10 (D. Haw. Feb. 27, 2008) (applying the Restatement of Agency § 228 in determining immunity under § 350-3).  This result in *Haldeman*, however, was later reversed by the Ninth Circuit without commenting on the scope of the analysis.  *See Haldeman v. Golden*, 359 F. Appx. 777, 780 (9th Cir. 2009) (mem.).  In any event, even assuming a scope-of-employment test is relevant, Plaintiffs have not cited any evidence that the CWS Defendants were acting outside the scope of their employment as CWS workers, other than arguing that "kidnapping" is outside the scope.

331-4 at PageID.2756–2757.  Each of the Individual CWS Defendants explains

that their actions were performed within the scope of their duties as CWS workers

pursuant to Chapter 587A.  *See* ECF No. 331-1 at PageID.2745 (Leskovic); ECF

No. 331-2 at PageID.2749 (Cho); ECF No. 331-3 at PageID.2754 (Kaauwai-

Herrod); ECF No. 331-4 at PageID.2758 (San Augustine).  And Plaintiffs have

made no effort—much less cited to specific evidence—to point to any particular

act of any CWS Defendant that was outside the scope of their duties or

responsibilities under HRS Chapter 587A.  *Cf. Williamson v. Basco*, 2007 WL

4570496, at *7 (D. Haw. Dec. 31, 2007) (granting summary judgment in favor of a

government actor under § 350-3 where all conduct at issue was within the scope of

his responsibility as a Hawaii social worker).

> The court thus concludes that the Individual CWS Defendants have

statutory immunity under HRS § 350-3 for the negligence-based claims asserted

against them in Count III.  And such immunity also precludes Keahiolalo's cross-

claim against them for any liability under Count III.[34]

> Plaintiffs also argued that a state law immunity provision such as

§ 350-3 cannot preclude liability from a federal statute such as 42 U.S.C. § 1983.

*See* ECF No. 364 at PageID.3407.  The court agrees.  *See, e.g.*, *Kimes v. Stone*, 84

---

[34]  Given that immunity under § 350-3 applies, the court need not reach whether a
qualified privilege also protects these Defendants from the state law negligence claim.

F.3d 1121, 1127 (9th Cir. 1996) ("Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 . . . cannot be immunized by state law.") (quoting *Martinez v. Cal.*, 444 U.S. 277, 284 n.8 (1980)); *Sosa v. Hiraoka*, 920 F.2d 1451, 1460 n.3 (9th Cir. 1990) (noting under the supremacy clause that "state law immunities have no force against § 1983 suits where the state law immunity purports to provide immunity 'over and above those already provided in § 1983.'") (quoting *Howlett v. Rose*, 496 U.S. 356, 375 (1990)).  But the Individual CWS Defendants never made such an argument; their Motion *only* asserted immunity from state law claims.  *See* ECF No. 330-1 at PageID.2723; ECF No. 387 at PageID.3731 & n.7.  To be clear, however, immunity under § 350-3 does not apply to the § 1983 allegations in Count I.

Accordingly, the Individual CWS Defendants' Motion is GRANTED as to Count III and Keahiolalo's crossclaim against them.

### 4.    *Keahiolalo's Crossclaim*

The Individual CWS Defendants also face a crossclaim brought by Keahiolalo asserting a § 1983 claim against them based on the January 3, 2020 removal of B.D. from Keahiolalo after they learned (allegedly for the first time) about the February 14, 2012 Family Court Order.  *See* ECF No. 129-1 at PageID.1043–1045.  That crossclaim would have to be based on a deprivation of Keahiolalo's clearly established constitutional rights of familial association.  They

also face a crossclaim for negligence from Keahiolalo, and a contribution/ indemnification claim if Keahiolalo becomes liable to Plaintiffs.  *Id.* at PageID.1046–1047.  Thus, the Individual CWS Defendants also move for summary judgment as to Keahiolalo's crossclaims.

   *David I* addressed Keahiolalo's crossclaim against Kaulukukui.  In particular, in addition to denying qualified immunity to Kaulukukui for Plaintiffs' claims at that motion-to-dismiss stage, *David I* dismissed Keahiolalo's crossclaims against Kaulukukui.  *See David I*, 2021 WL 1234499, at *9–10 (finding that even if Kaulukukui did not have qualified immunity as to Plaintiffs' federal claim, she did have immunity as to Keahiolalo's § 1983 crossclaim, and dismissing the negligence crossclaim against Kaulukukui for implausibility).  The court, however, had no occasion to address the viability of the crossclaim against the Individual CWS Defendants at that time because *David I* dealt only with a motion brought by Kaulukukui.  *See id.* at *9 ("[T]he court focuses here on the allegations against Kaulukukui [in the crossclaim], and not the other Crossclaim Defendants.").  The crossclaim aspects of *David I* were not subject to interlocutory appeal, but nevertheless are still applicable.

   And for similar reasons that Keahiolalo's crossclaim fails as to Kaulukukui, it fails as to the Individual CWS Defendants.  A § 1983 claim is barred because it is undisputed that the Individual CWS Defendants on January 3,

2020 (at that point, only Lescovic and Kaauwai-Herrod) were removing B.D. from Keahiolalo because the February 14, 2012 Family Court Order specifically provided that "Hannah David shall continue to have sole legal and physical custody of [B.D.]" and that "Father shall have no visitation, supervised or otherwise, with [B.D.]." *E.g.*, ECF No. 335-25 at PageID.3048.  That Family Court Order—which they claim to have only learned about on January 2, 2020—established that Keahiolalo had no right to custody of B.D.  Under that order, prompt removal of her from Keahiolalo was proper.

Any dispute of fact as to their knowledge of his lack of custody rights, would only mean that B.D. should have been removed from Keahiolalo's custody *earlier*.  Even if Keahiolalo thought—construing disputes of fact in his favor—that he had retained parental rights enabling him to have custody, the focus is on the information available to the Individual CWS Defendants.  And, given the February 14, 2012 Family Court Order, they certainly acted reasonably in removing B.D. from Keahiolalo, and placing her in temporary foster custody, on January 3, 2020.  They have qualified immunity from Keahiolalo's § 1983 crossclaim.

Similarly, as discussed earlier, the same statutory immunity under HRS § 350-3(b) that bars Plaintiffs' negligence claims against the Individual CWS Defendants also applies to bar Keahiolalo's negligence crossclaim against them.  That is, it is undisputed that actions taken on January 3, 2020, were within the

scope of the Individual CWS Defendants' duties and responsibilities under HRS

§ 350-2 or HRS Chapter 587A.  At that point, they were acting under § 587A-9,

which, again, authorizes the CWS to "[a]ssume temporary foster custody" in

situations of imminent harm.  No evidence indicates otherwise.  State law

immunity applies to that state law counterclaim.

        Accordingly, the Individual CWS Defendants' Motion is GRANTED

as to Keahiolalo's crossclaim.  The crossclaim is dismissed.

### E.  Plaintiffs' Motion for Partial Summary Judgment (Joined by Keahiolalo)

        Finally, given the questions of fact identified in the court's rulings on

all the other Motions and Joinders, it easily follows that questions of fact preclude

Plaintiffs' affirmative Motion for Partial Summary Judgment as to Liability, ECF

No. 334.

        Plaintiffs' Motion seeks the entry of summary judgment in their favor

as to various types of liability asserted in the FAC, articulating ten different

complicated factual propositions.  *Id.* at PageID.2866–2869.  At minimum, all of

those propositions rely, to some extent, on a finding that—at the time the various

actions were taken in December 2019 and January 2020—each Defendant knew or

should have known that Keahiolalo had no legal rights to custody or visitation with

B.D., and knew that they were not authorized to remove B.D. from David's

custody.  But as established with the other Motions, there are numerous disputes of

76

fact regarding whether, or when, each Defendant knew or should have known about his custodial rights.  Not only are there questions of fact about whether misrepresentations or omissions were made in judicial proceedings, there are questions about whether they were made deliberately or recklessly.  *See David II*, 38 F.4th at 800.  There are also questions of fact about the reasonableness of the investigation and whether any defendant had "reasonable cause to believe" that B.D. was "in imminent danger of serious bodily injury."  *Keates*, 883 F.3d at 1236.  And there are questions about whether the timing, length, and nature of B.D.'s removal from David (that is the "scope, degree, and duration") were "reasonably necessary" to avert the perceived harm to B.D.  *See id.* at 1238.

It bears emphasizing that for Plaintiffs to prevail at the summary judgment stage on a claim for which it would bear the burden of proof at trial, they "must establish beyond peradventure all of the essential elements of [their] claim[s]."  *Fontenot*, 780 F.2d at 1194.  They "must come forward with evidence which would entitle [them] to a directed verdict [or, in modern terms, a judgment as a matter of law] if the evidence went uncontroverted at trial."  *C.A.R. Transp. Brokerage Co.*, 213 F.3d at 480 (citation omitted).  Given that standard, the court DENIES Plaintiffs' Motion for Partial Summary Judgment, ECF No. 334, and DENIES Keahiolalo's substantive Joinder, ECF No. 341.

# V.  <u>CONCLUSION</u>

As set forth in the Introduction, the court

(1) GRANTS Betts' Motion for Summary Judgment, ECF No. 332, which was joined by the Individual CWS Defendants, ECF No. 374;

(2) GRANTS Iseri's Motion for Summary Judgment, ECF No. 336;

(3) DENIES Kaulukukui's Motion for Summary Judgment, ECF No. 328;

(4) GRANTS Kaulukukui's Motion to Strike Declaration of Cynthia Garcia, ECF No. 352, which was joined by Betts, ECF No. 367;

(5) GRANTS in part and DENIES in part the Individual CWS Defendants' Motion for Summary Judgment, ECF No. 330, which was joined by Betts, ECF No. 366; and

(6) DENIES Plaintiffs' Motion for Partial Summary Judgment as to Liability, ECF No. 334, which was joined by Keahiolalo, ECF No. 341.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, May 15, 2024.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*David v. Betts et al.*, Civ. No. 20-00002 JMS-WRP, Order Granting in Part and Denying in Part Motions for Summary Judgment and Related Joinders